RCJJ, LLC v. RCWIL Enters., LLC, 2016 NCBC 44.

STATE OF NORTH CAROLINA

COUNTY OF NEW HANOVER

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
14 CVS 3392

RCJJ, LLC; DO GOOD REAL ESTATE, LLC;   )
DO GOOD REAL ESTATE OF WILMINGTON,)
LLC and JOHNATHAN JACKSON,          )
                Plaintiffs,          )
          v.                   )
                             )
RCWIL ENTERPRISES, LLC d/b/a Nest   )
Realty Wilmington and RYAN CRECELIUS,  )
              Defendants.          )

OPINION AND ORDER ON MOTION
FOR SUMMARY JUDGMENT

THIS CAUSE, designated a mandatory complex business case by Order of the Chief Justice of the North Carolina Supreme Court, pursuant to N.C. Gen. Stat. § 7A-45.4(b) (hereinafter, references to the North Carolina General Statutes will be to "G.S."), and assigned to the undersigned Special Superior Court Judge for Complex Business Cases, comes before the Court upon Defendants' Motion for Summary Judgment, pursuant to Rule 56 of the North Carolina Rules of Civil Procedure ("Rule(s)"). On February 22, 2016, the Court held a hearing on the Motion.

THE COURT, after reviewing the Motion for Summary Judgment, briefs in support of and in opposition to the Motion for Summary Judgment, the record evidence filed by the parties, the arguments, and other appropriate matters of record, FINDS and CONCLUDES as stated herein.

*Shipman & Wright, LLP, by W. Cory Reiss, Esq. for Plaintiffs.*

*Murchison, Taylor & Gibson, PLLC, by Michael Murchison, Esq. for Defendants.*

McGuire, Judge.

I.     FACTUAL AND PROCEDURAL BACKGROUND.

1.     In March, 2010, Ryan Crecelius' ("Crecelius") formed Do Good Real Estate, a real estate brokerage firm that donated a percentage of its commissions to charity.[1] Do Good Real Estate operated in the Wilmington, North Carolina area. Crecelius operated the business as a sole proprietorship.[2]

2.     In early 2012, Crecelius discussed expanding the Do Good Real Estate with Johnathon Jackson ("Jackson"), a longtime friend who lived in New York at the time.[3] In May, 2012, Jackson invested $25,000 for 50% equity in the business.[4] As part of the investment agreement, Jackson and Crecelius organized RCJJ, LLC ("RCJJ"), in which Jackson and Crecelius each held a 50% interest. Jackson and Crecelius also formed Do Good Real Estate, LLC, in which RCJJ was the sole member, and Do Good Real Estate Wilmington, LLC, in which Do Good Real Estate, LLC, was the sole member.[5] (RCJJ Holdings, LLC, Do Good Real Estate, LLC, and Do Good Real Estate Wilmington, LLC are collectively referred to hereinafter as "Do Good."). Jackson and Crecelius entered into a written Operating Agreement for RCJJ.[6] The Operating Agreement contained non-competition and non-solicitation covenants. The covenants prohibited Jackson and Crecelius while they were members of RCJJ "and for a period of six months thereafter" from competing with RCJJ and from employing any employee of RCJJ.[7]

---

[1] Exh. 2, ¶ 2.
[2] Exh. 6, p. 23
[3] Exh. 2, ¶ 3.
[4] *Id.*; Exh. 6, p. 23.
[5] Exh. 6, pp. 23-26.
[6] Exh. 19.
[7] *Id.* § 6.6. Crecelius also executed written operating agreements for Do Good Real Estate, LLC and Do Good Real Estate of Wilmington, LLC, neither or which contain a non-competition or non-solicitation covenant. Exh. 95. Since RCJJ was the sole member of the Do Good entities, however, the parties do not appear to dispute that the covenants in the RCJJ Operating Agreement applied to Crecelius in his role in Do Good.

3. Jackson was Do Good's Chief Financial Officer, and Crecelius was Chief Executive Officer and broker-in-charge ("BIC") with responsibility for the company's sales and day-to-day operations.[8] Do Good associated its first real estate agent in the spring of 2013 and by August 2014 had 13 agents.[9] The agents were independent contractors. Do Good required the agents to execute a "Confidentiality and Non-Solicitation Agreement" ("Confidentiality Agreement").[10] The Confidentiality Agreements prohibited the use and disclosure of certain confidential and proprietary information, including databases and computer programs, following termination of the agent's relationship with Do Good. The Confidentiality Agreements also prohibited the agents, while associated with Do Good, from "undertak[ing] the planning or organizing of any business activity competitive with Do Good Real Estate."[11]

4. Defendants allege that in the spring and summer of 2014, Jackson's behavior led to a deterioration of Crecelius' and Jackson's relationship. Defendants allege that Jackson treated Do Good's agents poorly, which negatively affected agent morale, and that Jackson was distracted from Do Good's business by other business ventures in which he was involved.[12] Jackson denies that he caused problems for Do Good. Nevertheless, it is undisputed that on or about July 20, 2014, Jackson and Crecelius began discussing separating their interests in Do Good.[13] Approximately two days later, Crecelius informed the agents that he and Jackson were having a dispute and that Crecelius anticipated Jackson would be leaving the Company.[14]

---

[8] Exh. 2, ¶ 5.
[9] *Id.* at ¶ 6; Exh. 63, ¶ 7.
[10] The parties have not placed in the record the Confidentiality Agreements executed by the agents. A copy of the Agreement form, however, is contained in Exhibit 27 (Appendix B).
[11] *Id.*
[12] *Id.* at ¶ 8.
[13] Exh. 63 ¶12.
[14] *Id.* at ¶ 10.

a. *Negotiation of the Separation Agreement and Release*.

5.      From July 20 through August 13, 2014, the parties negotiated over Crecelius buying-out Jackson's interests in Do Good.  On August 14, 2014, however, Crecelius withdrew his offer to buy Jackson's interests in Do Good for $100,000.00 and a share of certain future commissions, and communicated to Jackson that he would proceed to dissolution unless Jackson bought out his interest in Do Good.[15]  Thereafter, Jackson and Crecelius negotiated the terms of a buyout by Jackson, focusing on the valuation of Crecelius' interest in Do Good and on releasing Crecelius from his non-compete and non-solicitation obligations.[16]

6.      It is undisputed that as of July 30, 2014, Jackson and Crecelius retained attorneys to negotiate the separation of their interests in Do Good on their respective behalves, and the remaining negotiations were conducted through counsel. On August 20, 2014, Jackson and Crecelius reached an agreement in principle for Crecelius to sell his interest in Do Good for $25,000.00 and, *inter alia*, a release from the non-compete, non-solicitation, and any other contractual obligation with respect to Do Good.[17]

7.      On the evening of August 25, 2014, Jackson and Crecelius executed a Separation Agreement and General Release (the "Separation Agreement").  Jackson executed the Separation Agreement in his individual capacity and on behalf of Do Good.  The Separation Agreement required Jackson to pay Crecelius $25,000.00 for his interests in Do Good.  In exchange, Crecelius withdrew as a member and officer of Do Good.  The Separation Agreement also required Crecelius to "return to Jackson any keys or other company property in his possession" and "to transfer to Jackson . . . online systems and accounts" including Highrise and other databases.[18]  The Separation Agreement did not expressly address

---

[15] Exh. 6, pp. 60-65.
[16] Exh. 2b (Murchison, August 14, 2014, email).
[17] Exh. 2b (Toups, August 20, 2014, email).
[18] Exh. 1, §§ 10 and 12.

whether Crecelius had the right to retain copies of the databases or information from the databases.

8.      The Separation Agreement released Crecelius from any non-compete, non-solicit, and any other contractual obligations to Do Good, specifically including the covenants contained in the RCJJ Operating Agreement.[19]  The Separation Agreement also contained broad mutual releases of claims, including Do Good's and Jackson's release of all claims against Crecelius.[20]

b.  *RCWIL and Nest Realty*.

9.      While negotiating with Jackson, Crecelius began to plan for his future after the separation.  On August 13, 2014, Crecelius communicated with Jonathon Kauffmann ("Kauffmann"), a principal in Nest Realty in Charlottesville, Virginia, about the possibility of affiliating with Nest in the Wilmington area.[21]  On August 20, 2014, Crecelius met with Kauffmann and reached a preliminary agreement that Crecelius could establish a Nest office in Wilmington.[22]  On August 21, 2014, Crecelius formed RCWIL, LLC ("RCWIL").[23]  On August 22, 2014, Crecelius filed an application for a real estate license for RCWIL.[24]  RCWIL, doing business as Nest Realty, secured its license from the North Carolina Real Estate Commission (the "Commission") on August 28, 2014, and began operations on August 29, 2014.[25]  All of Do Good's agents except for one terminated employment with Do Good and went to work for Crecelius at Nest.[26]

---

[19] *Id*. at § 6.
[20] *Id*. at §§ 13-14.
[21] Exh. 2, ¶ 20; Exh. 43.
[22] *Id*.
[23] Exh. 2, ¶ 21.
[24] *Id*.
[25] *Id*. at ¶ 24.
[26] *Id*.

10. It is undisputed that while Jackson and Crecelius were negotiating over the sale of their interests, Do Goods' agents were communicating to Crecelius' that they did not intend to work for Jackson if he retained Do Good, and would come to work for Crecelius if he created a new real estate brokerage. Crecelius did not tell Jackson about these communications with the agents. Crecelius contends only that he "was pretty confident" that the agents would follow him to Nest, but other evidence in the record belies this claim.[27] On August 13, 2014, Crecelius sent an email to Kauffmann stating that Crecelius had "the support of all of our agents if I decide to remove myself from [Do Good] and start something new."[28] On August 18, 2014, Crecelius emailed Kauffmann that "ALL 15 of [Do Good's] agents will be making the move with me" to Nest.[29] While there is no evidence that Crecelius solicited agents to leave Do Good, it is undisputed that he encouraged them not to reveal Crecelius' plans, to avoid contact with Jackson at certain times, and to not say or do anything to make Jackson suspicious.[30]

11. Jackson claims that he only "expected to lose two or three agents" and that had he known that all of the agents would leave, he would not have entered into the Separation Agreement.[31] Jackson admitted, however, that Jamie Jankowski had told him she was leaving Do Good, and that other agents told him that "they were undecided about their plans or were thinking about their options."[32] On July, 28, 2014, Jackson and Crecelius met with business advisor Dallas Romanowski, and Romanowski told Jackson that if he bought-out

---

[27] Exh. 2, ¶ 23.
[28] *Id.*
[29] Exh. 44 (capitalization in original).
[30] Exhs. 48, 51, 52, and 54.
[31] Exh. 63, ¶ 14-15.
[32] *Id.* ¶ 24.

Crecelius, "the agents/brokers would very likely leave" Do Good.[33] On August 5, 2014, Crecelius texted Jackson indicating that Jankowski was likely to leave Do Good and "when she leaves you can bet a few others will too."[34] On August 8, 2014, Crecelius texted Jackson that "several" of the agents were threatening to leave Do Good, and that Crecelius "can't control them leaving."[35] Jackson responded that he had "an idea of who would leave if I buy. I'm willing to take the risk."[36] Finally, Benton Toups, the attorney who represented Jackson in the negotiations with Crecelius, testified that he "knew during the course of negotiations that there was a possibility that most or all of the agents would leave Do Good after the transaction."[37]

### d. *Do Good's confidential information.*

12. Do Good maintained various databases, including Highrise and Dropbox, and other information that it characterizes as trade secrets or confidential information. The Highrise database allowed Do Good to catalog current customer information and potential customer leads from various public and private sources.[38] Each recorded contact was supplemented by additional individualized information such as the property's sale history, contact phone numbers, the client's marital history and spouse name, employment, social club information and other potentially impactful data on the customer or potential customer.[39] Jackson claims Do Good spent approximately $17,000.00 in "direct expenditures," and significant time in compiling, organizing and tagging the data in

---

[33] Exh. 4, Romanowski Aff. (8/10/15) ¶9; Exh. 92, Romanowski Aff. (10/14/15) ¶6.
[34] Exh. 2, ¶ 13; Exh. 23.
[35] *Id.*
[36] *Id.*
[37] Exh. 3, Toups Aff. (8/20/15) ¶4; Exh. 92, Toups Aff. (10/13/15) ¶ 4.
[38] Exh. 83, ¶¶ 16-26.
[39] Second Am. Compl. ¶ 54; Defs. Br. at 10.

Highrise.[40]  Dropbox contained files on individual Do Good clients, raw data used to build the High Rise database, and "strategic company documents."[41]

13.    It is undisputed that Crecelius downloaded the Highrise database on August 23, 2014, and the Dropbox data on August 24, 2014, and did not disclose these downloads to Jackson.[42]  Immediately before the Separation Agreement was executed on August 25, 2014, Crecelius also downloaded his Do Good email account.  Crecelius contends that he regularly made backup copies of these files "to comply with the record preservation and retention requirements in the [North Carolina Real Estate] Commission rules."[43]  It also is undisputed that Crecelius advised some of Do Good's agents to download information that he claimed they were required to retain under the Commission's rules.[44]  Plaintiffs dispute that the Commission's rules require agents to keep all of the information that Crecelius and other agents downloaded from Do Good's systems.

14.    On September 5, 2014, Plaintiffs' counsel informed the former Do Good agents that they had breached their "Contractual and Fiduciary Duties to Do Good Real Estate" by having "downloaded, saved, or otherwise acquired electronically stored information from DGRE's computers, computer network, servers and/or proprietary databases."[45]  The electronically stored information at issue were the "emails, customer lists, customer contact information, sales leads, and other proprietary information."[46]

15.    On September 10, 2014, Defendants' counsel responded that the agents were simply complying with Commission rules and Do Good policies.[47]  Defendants' counsel stated

---

[40] Exh. 63, ¶ 45.
[41] Exh. 83, ¶ 36.
[42] Exh. 2, ¶ 29.
[43] *Id.*
[44] See, e.g. Exhs. 53 and 72.
[45] Exh. 2.f.
[46] *Id.*
[47] Exh. 2g.

that, to Defendants' knowledge, no agents had downloaded any information from Highrise and Crecelius had not shared any Highrise information with the agents.[48]  Each of the agents subsequently signed sworn affidavits stating that they had not accessed any of their emails from the Do Good email accounts after their respective separations from Do Good.[49]

16.     On September 23, 2014, Plaintiffs filed a Complaint (the "Initial Complaint") against Defendants and the former Do Good real estate agents who joined Nest Realty.  Since filing the Amended Complaint, Plaintiffs have voluntarily dismissed their claims against all but two Defendants, RCWIL and Crecelius.[50]

17.     On September 30, 2014, Crecelius, by letter from his counsel, sent Plaintiffs' counsel a flash drive containing the Highrise database.[51]  The letter stated that Crecelius had not reviewed the database, had not shared it with any third parties, had not copied it, and had expunged it from his computers.[52]  Crecelius, however, made clear that he subscribed to a document recovery system (known as "Time Machine") which enabled him to unearth deleted computer files such as those contained in Highrise.  Crecelius could not completely eliminate his ability to unearth Highrise files without disabling Time Machine or destroying his computer's hard drive.  While he committed to not access Highrise, Crecelius declined to disable Time Machine, as he believed it was necessary to ensure compliance with Commission rules and regulations.[53]

---

[48] *Id.*

[49] Exh. 28.

[50] Voluntary Dismissal with Prejudice as to Defendant Eric Gardner Knight (Nov. 26, 2014); Voluntary Dismissal with Prejudice as to Defs. E. Bianchini, S. Harkins, Q. Jones and C. Anderson (Dec. 17, 2014); Voluntary Dismissal with Prejudice as to Defs. Heal, Young, Jankowski, Warrington and Lucas (Feb. 11, 2015).

[51] Exh. 32.

[52] Exh. 32.

[53] *Id.*

18.     On March 30, 2015, the Court issued a Preliminary Injunction Order that enjoined and prohibited Defendants from disclosing or using the information contained in Highrise or the Database Folder in Dropbox (the "Database") for any purpose related to conducting Defendants' business. On April 14, 2015, Crecelius informed Plaintiffs that he had purged his personal computer of Highrise and the Database. Crecelius further claimed in the April 14, 2015, communication to have removed anything reasonably related to Do Good from his computer and, in an excess of caution, that he had deposited his hard drive with counsel. Plaintiffs do not allege that Defendants have not complied with that Order.

19.     On September 4, 2015, Plaintiffs filed their Second Amended Complaint (the "Second Amended Complaint"). The Second Amended Complaint contained the following claims: (a) Tortious Interference with Contractual Relations ("First Claim for Relief"), (b) Misappropriation of Trade Secrets ("Second Claim for Relief"), (c) Fraud ("Third Claim for Relief"), (d) Fraud in the Inducement ("Fourth Claim for Relief"), (e) Punitive Damages ("Fifth Claim for Relief"), (f) Unfair and Deceptive Trade Practices ("Sixth Claim for Relief"), (g) Breach of Contract ("Seventh Claim for Relief"), (h) Breach of Fiduciary Duties ("Eighth Claim for Relief"), (i) Constructive Fraud ("Ninth Claim for Relief"), (j) Injunctive Relief ("Tenth Claim for Relief"),(k) Conversion ("Eleventh Claim for Relief"), (l) Unjust Enrichment in the alternative, ("Twelfth Claim for Relief"), and (m) Rescission in the alternative ("Thirteenth Claim for Relief").[54]

20.     On September 30, 2015, Defendants filed the Motion for Summary Judgment and Motion to Enforce Settlement Agreement (the "Motion") as to all of Plaintiffs' claims in the Second Amended Complaint. The Motion has been fully briefed and argued, and is ripe for determination.

---

[54] Second Am. Compl. ¶¶ 73-159.

II.    ANALYSIS.

21.    Defendants move, pursuant to Rule 56, for summary judgment in their favor on all of Plaintiffs' claims. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that any party is entitled to judgment as matter of law." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012). An issue is "material" if its "resolution . . . is so essential that the party against whom it is resolved may not prevail." *McNair v. Boyette*, 282 N.C. 230, 235, 192 S.E.2d 457, 460 (1972). The moving party bears "the burden of clearly establishing lack of a triable issue" to the trial court. *N.C. Farm Bureau Mut. Ins. Co. v. Sadler*, 365 N.C. 178, 182, 711 S.E.2d 114, 116 (2011). The moving party may meet this burden by "proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would have been barred by an affirmative defense." *Variety Wholesalers, Inc.*, 365 N.C. at 523, 723 S.E.2d at 747.

22.    The Court will first address Plaintiffs allegations of fraud since they are central to many of Plaintiffs' claims in this action and directly impact the enforceability of the Separation Agreement. Defendants contend that all of Plaintiffs' claims except for the claims for tortious interference and breach of contract are barred by Do Good and Jackson's release of claims against Crecelius in the Separation Agreement.[55] A release "operates as a merger of, and bars all right to recover on, the claim or right of action" covered by the release. *Fin. Servs. of Raleigh, Inc. v. Barefoot*, 163 N.C. App. 387, 392, 594 S.E.2d. 37, 41 (2004) (citing *Jenkins v. Fields*, 240 N.C. 776, 778, 83 S.E.2d 908, 910 (1954)). Nevertheless, "[a] release may be avoided upon evidence that it was executed as a result of fraud or mutual

---

[55] Defs.' Br. Supp. Mot. Summ. J. p. 10.

mistake." *Best v. Ford Motor Co.,* 148 N.C. App. 42, 45, 557 S.E.2d 163, 165 (2001), *aff'd,* 355 N.C. 486, 562 S.E.2d 419 (2002).

### a. *Fraud and Fraudulent Inducement.*

23.     In their Third and Fourth Claims for Relief, Plaintiffs allege that Crecelius individually, and as an agent for RCWIL, made misrepresentations and concealed material facts during the negotiations over the Separation Agreement. Plaintiffs contend that Crecelius affirmatively misrepresented "[t]hat Crecelius would sell to Mr. Jackson all rights to and ownership of all assets of Do Good, would turn over control of certain systems and databases . . . and would return all property of Do Good in Mr. Crecelius' possession . . . ."[56] Plaintiffs further allege that Crecelius concealed that he had "acquired," "intended to retain," and "did not intend to return" the Highrise database and "other confidential and proprietary" information and emails of Do Good.[57] Finally, Plaintiffs contend that Crecelius concealed from Jackson the fact that "he had already obtained commitments from Do Good's real estate agents to leave Do Good for Nest Realty."[58]  Plaintiffs allege that but for the misrepresentations and concealments Jackson "never would have executed the Separation Agreement" and that the "Separation Agreement is unenforceable against the Plaintiffs." Plaintiffs also allege that they have been injured by Defendants' fraud.[59] Accordingly, the Court must consider both the impact of the alleged fraudulent conduct on the enforceability of the Separation Agreement, and Plaintiffs' claims that the same conduct resulted in injury to Plaintiffs for which Plaintiffs may recover damage.

---

[56] Second Am. Compl. ¶¶ 91.c., 103.
[57] *Id.* ¶¶ 94.b.– f., 103
[58] *Id.* ¶ 94.g.
[59] *Id.* ¶¶ 100, 101, 107, and 108.

24. To prove both fraud and fraud in the inducement claims,[60] one must show "(1) that defendant made a false representation or concealment of a material fact; (2) that the representation or concealment was reasonably calculated to deceive; (3) that defendant intended to deceive; (4) that plaintiff was deceived; and (5) that plaintiff suffered damage as a result from defendant's misrepresentation or concealment." *Claggett v. Wake Forest Univ.*, 126 N.C. App. 602, 610, 486 S.E.2d 443, 447 (1997). Additionally, the deceived party must have reasonably relied on the allegedly false representations. *Seraph Garrison, LLC v. Garrison*, 2016 N.C. App. LEXIS 384, *23 (N.C. Ct. App. Apr. 19, 2016) (citing *Forbis v. Neal*, 361 N.C. 519, 527, 649 S.E.2d 382, 387 (2007)).

25. "A claim for fraud may be based on an affirmative misrepresentation of a material fact, or a failure to disclose a material fact relating to a transaction which the parties had a duty to disclose." *Hardin v. KCS Int'l, Inc.*, 199 N.C. App. 687, 696, 682 S.E.2d 726, 733 (2009). "A duty to disclose arises where: (1) the fiduciary relationship exists between the parties to the transaction; (2) there is no fiduciary relationship and a party has taken affirmative steps to conceal material facts from the other; and (3) there is no fiduciary relationship and one party has knowledge of a latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence." *Id.*

26. Although Plaintiffs allege that Crecelius made affirmative misrepresentations and failed disclose or concealed facts regarding the return of certain confidential information to Do Good, the evidence supports only the allegations of a failure to disclose. Plaintiffs have

---

[60] To prove fraud in the inducement, one must show: (i) that defendant made a false representation or concealed a material fact he had a duty to disclose; (ii) that the false representation related to a past or existing fact; (iii) that defendant made the representation knowing it was false or made it recklessly without knowledge of its truth; (iv) that defendant made the representation intending to deceive plaintiff; (v) that plaintiff reasonably relied on the representation and acted upon it; and (vi) plaintiff suffered injury. *Harton v. Harton*, 81 N.C. App. 295, 298-99, 344 S.E.2d 117, 119-20 (1986).

provided no evidence that Crecelius made any statements or representations that that he had in his possession or intended to return any database or other information. In fact, it is undisputed that such information was never discussed as part of the negotiations over the "return of company property" the Separation Agreement. *Id.* at 702-03, 682 S.E.2d at 737 (fraud claim dismissed where the plaintiff failed to produce evidence of specific affirmative misrepresentation during settlement negotiations). Accordingly, the Court's determination of Plaintiffs' fraud claims focuses on whether Crecelius had a duty to disclose facts regarding his possession of the database information, and regarding the agents' intentions to leave Do Good.

27. The Court will address Crecelius' obligations arising from his fiduciary duties below. Even assuming that Crecelius did not have a duty to disclose based upon a fiduciary duty, there are disputed facts regarding whether he took "affirmative steps to conceal" material facts from Jackson, or had knowledge of a "latent defect" in the negotiations about which Jackson was ignorant. While there is no evidence that Crecelius took any affirmative steps to conceal the fact that he had Do Good database information, the evidence does create issues of fact regarding whether Crecelius actively concealed the agents' intentions to leave Do Good and knew that Jackson was under a misapprehension regarding the agents. The evidence shows that Crecelius encouraged various agents to avoid Jackson, to "play nice," and to avoid arousing Jackson's suspicions regarding their plans to join Crecelius in his new venture. The same evidence suggests that the Crecelius knew that Jackson did not understand that all of the agents intended to leave Do Good, and that Crecelius believed this information would be significant to Jackson and did not want him to discover the true facts prior to closing on the sale.

28. The Court concludes that there are issues of material fact as to whether Crecelius had a duty to disclose the agents' intentions to leave Do Good and engaged in fraud

in failing to do so that must be determined by a jury. Accordingly, the Separation Agreement is potentially void, and Defendants' Motion based on the release of claims must be DENIED. *Best*, 148 N.C. App. at 45, 557 S.E.2d at 165.[61] For the same reasons, Defendants' Motion as to Plaintiffs' claims for damages arising from Crecelius' failure to disclose the agents' intentions to leave Do Good should be DENIED.

29.     With regard to Plaintiffs claims for fraud arising from Crecelius' failure to disclose that he downloaded and possessed Do Good's confidential information, Plaintiffs have failed to produce evidence that they suffered any injury or damages. Plaintiffs have not alleged or produced evidence that Do Good lost any customers or specific sales as a result of confidential information that Crecelius downloaded. Plaintiffs' expert report regarding damages allegedly suffered by Do Good relies solely on the loss of the agents, and not on the use of confidential information.[62] Accordingly, even if Crecelius had a duty to disclose, Plaintiffs' claim fails and Defendants' Motion as to this allegation of fraud should be GRANTED.

   b.   *Breach of Fiduciary Duty and Constructive Fraud.*

30.     In their Eighth Claim for Relief, Plaintiffs allege that "Crecelius breached his duties of care, loyalty, and good faith to [Do Good] by taking steps prior to his separation from Do Good that were in his self-interest and contrary to the interests of Do Good, including . . . acquiring the Highrise database" and "planning and organizing a competing

---

[61] Since there exists issues of fact that create a question as to whether the Separation Agreement is an enforceable contract, Defendants' argument that Plaintiffs' fraud claims are barred by the economic loss rule also must fail. *See Artistic Southern Inc. v. Lund*, 2015 NCBC LEXIS 113, *29 (N.C. Super. Ct. 2015) (finding economic loss rule inapplicable in absence of existence of an enforceable contract).

[62] Exhs. 56 and 94.

business and soliciting Do Good's agents to do the same."[63]  Plaintiffs allege that this same

conduct also constituted a constructive fraud (Ninth Claim for Relief).[64]

31.     Crecelius was a member and manager of RCJJ, and was an officer of Do Good.

Pursuant to the North Carolina Limited Liability Act, a manager or officer of a limited

liability company "shall discharge that person's duties (i) in good faith, (ii) with the care an

ordinary prudent person in a like position would exercise under similar circumstances, and

(iii) subject to the operating agreement, in a manner the manager believes to be in the best

interests of the LLC."  G.S. §§ 57D-3-21(a); 57D-3-23; *see Kaplan v. O.K. Techs., L.L.C.*, 196

N.C. App. 469, 474, 675 S.E.2d 133, 137 (2009) (manager owed a fiduciary duty to the limited

liability company).  A manager, however, owes these duties to the company, rather than to

other members or managers of the LLC. [65]  *Id.*  An individual continues to serve as a manager

until he resigns from, transfers his "entire economic interest" in, or ceases to be a member of,

an LLC.  G.S. § 57D-3-20(e).

32.     The North Carolina Court of Appeals recently reiterated the substantial

obligations of due care and loyalty placed on corporate officers and directors under North

Carolina law. *Seraph Garrison, LLC*, 2016 N.C. App. LEXIS 384.  The Court held that "an

officer [must] always discharge the responsibilities of the office 'with undivided loyalty' to the

corporation" and "a director may not allow his self-interest to jeopardize his unyielding

obligations to the corporation." *Id.* at *8. This "imposes an affirmative obligation: a fiduciary

must strive to advance the best interests of the corporation." *Id.*  This obligation must be

carried out in good faith, "openly, honestly, conscientiously, and with the utmost devotion to

the corporation." *Id.* at *9.  Nevertheless, "the analysis of an officer's fiduciary conduct must

---

[63] Second Am. Compl. ¶¶ 129-131.
[64] *Id.* ¶¶ 133-136.
[65] Neither party contends that an operating agreement altered or relieved Crecelius of any fiduciary duties to Do Good as a manager or officer.

be judged in light of the background in which it occurs and the circumstances under which he serves the corporation." *Id.* at \*10.

33. Defendants first argue that the breach of fiduciary duty and constructive fraud claims are barred by the release contained in the Separation Agreement. The Court already has concluded that there are issues of fact to be resolved regarding the enforceability of the Separation Agreement. Accordingly, Defendants' argument that Plaintiffs' claims are barred by the release is misplaced and this argument fails.

34. Defendants also contend that "any fiduciary duties Crecelius might have had were extinguished by the initiation of adversarial discussions between [Do Good's] two principals regarding separation," and that Crecelius did not have an affirmative duty to disclose unfavorable facts to Jackson during the negotiation of the Separation Agreement.[66] North Carolina's courts have held that a duty to disclose arising from certain types of fiduciary relationships can be extinguished when the parties become adversarial and are represented by attorneys. *Piedmont Inst. of Pain Mgmt. v. Staton Found.*, 157 N.C. App. 577, 583-84, 581 S.E.2d 68, 72-73 (2003) (finding that the fiduciary duty trustee owed to beneficiaries ended when during negotiation of a settlement agreement, "both parties were represented by counsel" and "were negotiating for the termination of legal rights"); *Lancaster v. Lancaster*, 138 N.C. App. 459, 463, 530 S.E.2d 82, 85 (2000) ("while a husband and wife generally share a confidential relationship . . . It is well established that when one party to a marriage hires an attorney to begin divorce proceedings, the confidential relationship is usually over."); *Harton v. Harton*, 81 N.C. App. 295, 297, 344 S.E.2d 117, 119 (1986) (husband's fiduciary duty to wife ended when the parties separated and became adversaries negotiating over the terms of their separation).

---

[66] Defs.' Mem. Supp. Mot. for SJ, p. 25.

35. The question, then, is whether as a matter of law Crecelius was relieved of his fiduciary duties of care and loyalty by the adversarial negotiation with Jackson over the separation of their interests. This is an issue of first impression in North Carolina, and one on which very little guidance exists from other jurisdictions. In *Fender v. Prescott*, 476 N.Y.S.2d 128, 101 A.D.2d 418 (1984), *aff'd,* 64 N.Y.2d 1077, 479 N.E.2d 225 (1985), the court faced a similar scenario in which two 50% shareholders in a corporation got into a disagreement, decided to sever their relationship, and entered into a buy-sell agreement for the plaintiff to purchase the defendant Prescott's interest. *Id.* at 130-31, 101 A.D.2d at 420. The plaintiff alleged that after entering into the agreement but prior to closing the sale, Prescott diverted a corporate opportunity to his own benefit. *Id.* at 131, 101 A.D.2d at 421-22. The trial court entered summary judgment for Prescott holding that he owed no fiduciary duty to the plaintiff or the corporation. The appellate court reversed, holding as follows:

> Prescott, as a shareholder, officer and director of a close corporation, was subject to a standard of honesty and good faith which required that he devote his undivided and unqualified loyalty to the corporation. The fiduciary duty imposed upon him prevented him from placing his private interests in conflict with those of the corporation . . . . Contrary to the holding [of the trial court], the fiduciary duty thus imposed was not automatically extinguished by the agreement of the two principals to go their own way. After execution of the agreement, Prescott remained as an officer, director and shareholder of [the corporation] at least until the closing. Since the buy-out never took place, he was subject to the same fiduciary duty as existed previously and from which he would be relieved only upon his withdrawal from the corporation. To conclude otherwise would produce a most inequitable, unconscionable and inconsistent result, permitting him to rely upon the existence of the buy-out agreement to avoid his fiduciary obligation to the corporation and to plaintiff while simultaneously refusing to proceed to closing and transfer his shares in accordance with that very agreement. The strict standard of good faith imposed upon a fiduciary may not be so easily circumvented. Under the circumstances, we disagree with the conclusion of [the trial court] that the trust relationship terminated solely upon execution of the unperformed buy-sell agreement.

*Id.* at 132, 101 A.D.2d at 422-23.

36. The Court notes that our Court of Appeals addressed a manager's fiduciary obligations when negotiating over transfer of their interests in an LLC in the unpublished

decision in *Spanish Moss, LLC v. Wachovia*, 218 N.C. App. 456, 721 S.E.2d 764, 2012 N.C. App. LEXIS 158 (2012) (internal citations omitted).[67]  In *Spanish Moss*, the plaintiffs were members, and the defendants were members and managers, in two Florida LLCs.  2012 N.C. App. LEXIS 158, at *2.  The parties had a disagreement and negotiated a settlement agreement by which the plaintiffs acquired the defendants' interest in the LLCs.  *Id.*  The plaintiffs subsequently sued, alleging that they were fraudulently induced to enter into the settlement agreement because the defendants failed to disclose certain material facts.  *Id.* at *2-3.  The Court of Appeals noted that under Florida law, defendants owed a fiduciary duty to both the LLC and the other members of the LLC.  *Id.* at *14.  The Court held that the fiduciary relationship created an obligation to disclose on the defendants, but did not make clear whether it viewed that obligation as arising from defendants' fiduciary duty to the members of the LLC or their duty to the LLCs.  *Id.* at *14 -15.  The Court of Appeals held, however, that the duty to disclose based on the fiduciary relationship ended when the parties became "adversaries" negotiating over the settlement agreement.  *Id.*  Nevertheless, the Court of Appeals concluded that the defendants were obligated to disclose because "they took affirmative steps to conceal a material fact relating to the [settlement agreement]" and had knowledge of a "latent defect in the subject matter of the negotiations."  *Id.* at *15-16.

37.    The Court does not believe *Spanish Moss* squarely supports the proposition that a manager is relieved of his fiduciary duties to an LLC once the manager is engaged in negotiations to sell his interests in the company to the other members, and declines to adopt its reasoning.  First, as noted above, under Florida law the defendants as managers of the LLCs owed a fiduciary duty to the LLC *and* to the members.  Accordingly, the defendants

---

[67] N.C. R. App. P. 30(e)(3); *Long v. Harris*, 137 N.C. App. 461, 470, 528 S.E.2d 633, 639 (2000) ("An unpublished opinion 'establishes no precedent and is not binding authority.'").

owed a duty to the plaintiffs with whom they were negotiating separate and apart from their obligations to the LLC. Under North Carolina law, a manager does not have a fiduciary duty to the individual members of the company, and Crecelius did not have a fiduciary obligation to Jackson. *Kaplan*, 196 N.C. App. at 474, 675 S.E.2d at 137. The Court of Appeals does not expressly state whether the result would have been different had the defendants not had an independent duty to the plaintiffs as imposed by Florida law. This is significant because while a trustee owes a fiduciary duty directly to the beneficiary, and spouses owe a duty to one another, a manager owes a fiduciary duty not to the other member or members with whom he may be in an adverse negotiation, but to the LLC. This makes the reasoning behind those cases relieving a trustee or spouse of fiduciary duties when engaged in adversarial negotiations an uneasy fit in the corporate fiduciary setting.

38. More significant is the fact that the cases holding that a fiduciary duty can be extinguished in an adversarial setting, and upon which *Spanish Moss* relies, did not hold that the fiduciary was relieved of his duties merely because the parties had retained attorneys or were negotiating over a separation of interests. Rather, those cases make clear that the facts surrounding the adversarial negotiation must establish that there has been a change in the trusted and confidential nature of the relationship and that the fiduciary has repudiated his fiduciary duties. *Piedmont Inst. of Pain Mgmt.*, 157 N.C. App. at 583, 581 S.E.2d at 72-73 (2003) ("[T]he Piedmont Parties concede that at the time of the settlement negotiations both parties were represented by counsel, both parties were negotiating for the termination of legal rights, and that, as of March 1996, Phillip Staton had *repudiated his fiduciary duties*" by informing the Piedmont Parties that he would no longer fund the foundation) (emphasis added); *Lancaster*, 138 N.C. App. at 463 -64, 530 S.E.2d at 85 (2000) (holding that facts surrounding husband's and wife's separation and negotiation of separation

agreement "indicates that the couple did not share a trusted and confidential relationship"); *Harton*, 81 N.C. App. at 297-98, 344 S.E.2d at 119 (1986) (holding that evidence that couple had been separated before seeking out attorney to draw up separation agreement, plaintiff's wife had not consulted with husband after the separation but instead was relying on son-in-law's advice, and only husband was represented by attorney established that "[t]he relationship of trust and confidence normally present between fiduciaries had ended").

39. The record in this case does not establish that Crecelius clearly repudiated his fiduciary obligations to Do Good prior to the execution of the Separation Agreement. As of July 30, 2014, both Crecelius and Jackson had retained and were communicating through counsel regarding the future of Do Good, and were in that sense adversarial. Crecelius, however, did not owe a fiduciary duty to Jackson. Rather, his role as a manager and officer created a duty to Do Good. Crecelius continued to function as Do Good's BIC and was involved in management of the company until the sale was completed. Crecelius did not resign his positions as a manager or officer of Do Good during the negotiations, and there is no evidence that Crecelius notified Jackson that he was relinquishing his duties of care and loyalty prior to the consummation of the sale of his interests to Jackson. The Limited Liability Company Act provides that an individual ceases to a manager of an LLC only if he resigns as manager, transfers his "entire economic interest" in the LLC, or ceases to be a member of the LLC. G.S. § 57D-3-20(e). In this case, Crecelius sold his interests in Do Good, and ceased to be a member and resigned as an officer, on August 25, 2014.[68]

40. The Court concludes that the court's reasoning in *Fender* is more closely aligned with the nature of the fiduciary duty at issue in this action. Allowing a manager of a limited liability company to be relieved of his fiduciary duties upon entering into adverse

---

[68] Exh. 1, ¶¶ 1 and 2.

negotiations for the sale of his interests in the company would be inconsistent with the nature of those duties. In addition, the appellate decisions do not support the conclusion that the commencement of adversarial negotiations and retention of attorneys relieves a fiduciary of his duties as a matter of law. Rather, there must be a change in the nature of the relationship between the parties that establishes that the parties no longer are in a relationship of confidence and trust, and that fiduciary duties have been repudiated. With regard to a manager's duties of loyalty and care to an LLC, the Court concludes that fiduciary duties could not be extinguished except upon cessation of a manager's relationship with the company as provided for in G.S. § 57D-3-20(e). Therefore, Crecelius' was not relieved of his fiduciary duty as a manager and officer of Do Good until the Separation Agreement was executed on the afternoon of August 25, 2014.

41.     "Claims for breach of fiduciary duty and constructive fraud both require proof of an injury or harm proximately caused by the breach of duty." *BDM Investments v. Lenhil, Inc.*, 2014 NCBC LEXIS 6, **29-30 (2014) (citing *Jay Grp., Ltd. v. Glasgow*, 139 N.C. App. 595, 600-01, 534 S.E.2d 233, 237 (2000)); *Progress Point One-B Condo. Ass'n, Inc. v. Progress Point One Prop. Owners Ass'n*, 2015 NCBC LEXIS 22, *10 (N.C. Super. Ct. 2015); *See also Green v. Freeman*, 367 N.C. 136, 141, 749 S.E.2d 262, 268 (2013) ("The first issue before us is whether there was sufficient evidence, as a matter of law, that Corinna breached a fiduciary duty owed to plaintiffs, proximately causing injury to them."); *Estate of Smith by & Through Smith v. Underwood*, 127 N.C. App. 1, 10, 487 S.E.2d 807, 813 (1997) ("The elements of a constructive fraud claim are proof of circumstances, (1) which created the relation of trust and confidence, and (2) led up to and surrounded the consummation of the transaction in which defendant is alleged to have taken advantage of his position of trust *to the hurt of plaintiff*.") (emphasis added; citation omitted). Plaintiffs alleged that they were injured by Crecelius' acquisition of Highrise for use in competition with Do Good, but have failed to

produce evidence of any specific injuries stemming from the alleged misappropriation of the database. To the contrary, Crecelius' testimony that he did not use or disclose any information in Highrise is unrebutted.[69] Plaintiffs have not alleged that Crecelius or Nest made a sale or retained any client by using Do Good's allegedly confidential information. Without any specific damages or injury stemming from the misappropriation, the Court cannot find that Crecelius breached his fiduciary duty to RCJJ when he exported the Highrise database. Accordingly, to the extent Plaintiffs' claims for breach of fiduciary duty or constructive fraud are based on Crecelius misappropriation of the Highrise database or other confidential information, Defendants' Motion should be GRANTED.

42. Plaintiffs' claim for breach of fiduciary duty based on Crecelius' failure to disclose that all of the agents intended to leave if Jackson purchased Do Good, however, is a different matter. Until the sale of his interests closed, Crecelius was obligated as a manager and officer of Do Good to "advance the best interests of" Do Good, and to carry out this obligation "openly, honestly, [and] conscientiously." *Seraph Garrison, LLC*, 2016 N.C. App. LEXIS 384, at **8-9. The Court concludes that, viewed in the light most favorable to Plaintiffs, there is a material dispute of fact as to whether Crecelius fulfilled his obligation of loyalty by failing to disclose what he knew about the agents' intentions to leave Do Good. In addition, there are disputed issues of fact regarding whether Crecelius encouraged the agents to conceal their plans to leave from Jackson. Further, in the light most favorable to Plaintiffs, Crecelius had a self-interest in making certain that nothing happened to impede the sale of his interests to Jackson, and may have personally benefited from the concealment of the agents' exodus. Therefore, Defendants' Motion on the breach of fiduciary duty and

---

[69] Exh. 2, ¶¶ 35-36.

constructive fraud claims based on Crecelius' failure to disclose or concealment of the agents' intentions should be DENIED.

### c. *Tortious Interference with Contractual Relations*.

43. Plaintiffs claim that Crecelius tortiously interfered with the contractual obligations the agents owed to Do Good to maintain the confidentiality of Do Good's proprietary and confidential information and to refrain from planning or organizing a competing business while working for Do Good (First Claim for Relief). In order to prevail on a claim for tortious interference with contract, a plaintiff must establish the following: (1) a valid contract existed between the plaintiff and a third party that conferred upon plaintiff contractual right against the third party; (2) the defendant was aware of the contract; (3) the defendant intentionally induced the third party not to comply with the contract; (4) the defendant did so without justification and (5) actual injury to plaintiff resulted. *United Labs v. Kuykendall*, 322 N.C. 643, 661, 370 S.E.2d 375, 387 (1988).

44. It is undisputed that Do Good had Confidentiality and Non-Solicitation Agreements with the agents, and that Crecelius was aware of the agreements. The undisputed facts regarding other elements of the claim, however, establish that Defendants are entitled to judgment as a matter of law on the claim for tortious interference. First, the facts establish that the agents did not breach the confidentiality provisions of the agreements. While each of the agents acknowledged that they downloaded their Do Good email accounts, it is undisputed that they did not access the accounts, and there is no evidence they used or disclosed the information in the email accounts.[70] The confidentiality agreements prohibited only the use, disclosure, and dissemination of the information. Simply downloading the emails does not appear to breach the obligations in the agreements. In

---

[70] Exh. 28.

addition, Plaintiffs have not presented any evidence, nor even argued, that it suffered an injury as result of the agents downloading their email accounts

45.     The evidence also does not create a triable issue of fact that the agents engaged in, or assisted Crecelius in the planning or organizing of a competing business.  To the contrary, the facts establish that, at most, the agents encouraged Crecelius in his plans to start another real estate brokerage firm so that they could join him in that venture.  There is no evidence that any of the agents took any affirmative steps in helping Crecelius form Nest Realty.  Plaintiffs contend that Jamie Jankowski "secured commitments from agents to follow" Crecelius to Nest, suggesting that she solicited those agents, but the evidence Plaintiffs point to in the record does not support this contention.[71]  Instead, the evidence shows that Jankowski merely communicated with agents and relayed their intentions to join Crecelius' new firm.

46.     The facts also do not support the allegation that Crecelius induced agents to breach their agreements by assisting with the planning or organizing of Nest. There is no evidence that Crecelius encouraged any of the agents to solicit other agents to Nest, or to take any other steps in support of his new business.  Rather, the record evidence shows that while Crecelius communicated with agents by text and email, he advised them only that he was planning another real estate business and that he would provide those details at an appropriate time.  These communications simply were not the type of purposeful conduct necessary to support a claim for tortious interference with contract.  *KRG New Hill Place, LLC v. Springs Investors, LLC*, 2015 NCBC LEXIS 20, *14 (N.C. Super. Ct. 2015) (holding inducement requires "purposeful conduct intended to influence a third party"); *Simply the Best Movers, LLC v. Marrins' Moving Sys.*, 2016 NCBC LEXIS 28, *7 (N.C. Super. Ct. 2016).

---

[71] Pl.'s Br. Opp. Mot. Summ. J. pp. 23-24; Several of Plaintiffs' citations to the record are to pages of depositions that have not been filed or to pages of depositions that do not exist.

47. Finally, Plaintiffs have not created a disputed issue of fact that Crecelius acted without justification and with malice in encouraging the agents to download their emails and communicating with the agents about his plans. "An interference is without justification if the defendants' motives for procuring termination of the employment contract were not reasonably related to the protection of a legitimate business interest of the defendant." *Filmar Racing, Inc. v. Stewart*, 141 N.C. App. 668, 674, 541 S.E.2d 733, 738 (2001) (internal quotations omitted). "In order to demonstrate the element of acting without justification, the action must indicate no motive other than malice." *Area Landscaping, L.L.C. v. Glaxo-Wellcome, Inc.*, 160 N.C. App. 520, 523, 586 S.E.2d 507, 510 (2003). If an individual has a sufficient lawful reason for inducing the breach, such as in the interest of competition, he is exempt from liability, regardless of his actual malice. *Robinson, Bradshaw, & Hinson, P.A. v. Smith*, 129 N.C. App. 305, 317, 498 S.E.2d 841, 850 (1998). A person acts with legal malice if he does a wrongful act or exceeds his legal authority to prevent the continuation of the contract between the two parties. "Even if plaintiff shows that defendant acted with ill intentions, legal malice does not exist unless plaintiff can show that defendant had no legitimate business justification for the interference." *Griffin v. Holden*, 180 N.C. App. 129, 140, 636 S.E.2d 298, 306 (2006) (citation omitted). The record evidence demonstrates only that Crecelius was motivated by his desire to establish a new real estate brokerage business, albeit one that would compete with Do Good, and does not create an issue of fact that he acted with legal malice. While Crecelius and Jackson were at odds during the period that they negotiated over the separation of their interests, the extensive record evidence does not contain evidence that Crecelius acted with a malicious intent, or otherwise exceeded his legal authority in communicating with the agents. Since competition, not malice, justified Crecelius' interactions with Jankowski and the other agents leading up the execution of the Separation Agreement, the facts establish that Crecelius did not act without justification.

48.     For the foregoing reasons, the Court concludes that Defendants Motion as to Plaintiffs' claim for tortious interference with contract should be GRANTED.

d. *Misappropriation of Trade Secrets*.

49.     Plaintiffs' Second Claim for Relief is for violation of the North Carolina Trade Secrets Act, G.S. § 66-152 et. seq.  Plaintiffs allege that Crecelius misappropriated Do Good's trade secrets when he exported the information and documents contained in the Highrise database, files from Dropbox, and Do Good's emails.[72]  In their brief, however, Plaintiffs rely solely on Crecelius downloading of the Highrise database in support of this claim.[73]  Accordingly, the Court limits its consideration of Plaintiffs' claim to the alleged misappropriation of Highrise.

50.     The North Carolina Trade Secrets Protection Act defines a "trade secret" as "business or technical information, including, but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that derives independent actual or potential commercial value from not being generally known or ascertainable through independent development or reverse engineering by persons who can obtain economic value form its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  G.S. § 66-152(3).  "Misappropriation" is defined as the acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such a trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret.  G.S. § 66-152(1).  A *prima facie* case for misappropriation may be made by showing that the defendant "(1) [k]nows or should have known of the trade secret; and (2) [h]as had a specific opportunity to acquire it for disclosure or use or has acquired,

---

[72] Second Am. Compl. ¶¶ 80-89.
[73] Pl.'s Br. Opp. Mot. Summ. J. pp. 31-33.

disclosed, or used it without the express or implied consent or authority of the owner." *Ge Betz, Inc. v. Conrad*, 231 N.C. App. 214, 234, 752 S.E.2d 634, 649 (2013) (quoting G.S. § 66-155). Actual damages are not an element of misappropriation of trade secrets claims, but may be recovered as "measured by the economic loss or the unjust enrichment caused by misappropriation," *in addition* to the injunctive relief specifically authorized by G.S. § 66-154(b).

51. It is undisputed that Crecelius knew of the Highrise database and acquired it by downloading it to his personal computer. Nevertheless, Defendants contend that the information in Highrise is not a trade secret, portraying Highrise as a compilation of non-proprietary information from both public sources and the agents themselves which were acquired with relatively little expense or time.[74] The evidence provided by Plaintiffs, however, is that Highrise contained a compilation of information obtained from a variety of sources that was cross-referenced and tagged by entries made at reasonably significant time and expense by Do Good.[75] The Court concludes that, viewed in the light most favorable to Plaintiffs, an issue of fact exists as to whether the compilation of information in Highrise constituted a trade secret. *Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C.*, 174 N.C. App. 49, 55, 620 S.E.2d 222, 228 (2005); *Byrd's Lawn & Landscaping, Inc. v. Smith*, 142 N.C. App. 371, 375-76, 542 S.E.2d 689, 692 (2001).

52. Defendants claim that Highrise was never shared with any of the agents or any third parties and has never been used by Crecelius following the execution of the Separation Agreement for any purpose, competitive or otherwise.[76] Defendants argue that these facts, along with the fact that the information in Highrise long ago exceeded its useful

---

[74] Defs.' Mem. Supp. Mot. Summ. J. p. 31; Defendants do not argue that Do Good did not take reasonable steps to maintain the secrecy of Highrise.
[75] Ex. 83, ¶¶ 9-34.
[76] Defs.' Mem. Supp. Mot. Summ. J. p. 30.

"shelf life," establish that Plaintiffs have suffered no damages from the alleged misappropriation.[77] As noted above, however, Plaintiffs are not required to establish damages arising from the alleged misappropriation in order to succeed on the claim. The Court acknowledges that Plaintiffs have not, at this stage, produced any evidence that they were damaged by Crecelius' acquisition of Highrise. Plaintiffs, however, are entitled to pursue permanent injunctive relief without showing actual damages.

53.    Defendants further argue that Crecelius did not misappropriate Highrise because he "routinely downloaded Highrise . . . long before the dispute with Jackson surfaced," and that he had a right to do so while he was a member of Do Good.[78] It is undisputed, however, that Crecelius downloaded the Highrise database to his personal computer for the final time on August 23, 2014, after the parties had reached an agreement in principal for the sale of Crecelius' interests in Do Good to Jackson and after Crecelius knew he was relinquishing his membership in Do Good. At the time, Crecelius had formed and registered Nest, and knew he would shortly be opening a new real estate brokerage firm. Even if Crecelius downloaded Highrise at a time when he technically still had a right to do so, Crecelius' retention of Highrise once the sale closed and he relinquished his membership in Do Good might qualify as an unlawful acquisition of the information. The Court concludes that viewed in the light most favorable to Plaintiffs, they have established a disputed issue of fact regarding whether Crecelius' acquisition of Highrise constituted misappropriation.

54.    The Court concludes that Defendants' Motion on Plaintiffs' claim of misappropriation of trade secrets in violation of the North Carolina Trade Secrets Act should be DENIED.

---

[77] *Id.*
[78] *Id.* p. 31.

e. *Unfair and Deceptive Trade Practices*.

55.     For a Sixth Claim for Relief, Plaintiffs allege that Defendants violated the North Carolina Unfair and Deceptive Trade Practices Act, G.S. § 75-1.1 et. seq. ("UDTPA"). Plaintiffs allege that Defendants engaged in unfair and deceptive practices by (a) acquiring and using Do Good's "proprietary and trade secrets information" to "jump start" Nest and compete in the real estate business,[79] (b) by interfering with Do Good's contracts with its agents,[80] and (c) Crecelius' misrepresentations and omissions during negotiation of the Separation Agreement.[81]

56.     G.S. § 75-1.1 declares unlawful any "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."  To state a claim under G.S. § 75-1.1, a plaintiff must allege (1) that the defendant committed an unfair or deceptive act or practice, or unfair method of competition, (2) in or affecting commerce, (3) which proximately caused actual injury to the plaintiff or his business.  *Birtha v. Stonemor, N.C., LLC*, 220 N.C. App. 286, 298, 727 S.E.2d 1, 10 (2012), *disc. rev. denied*, 366 N.C. 570, 738 S.E.2d 373 (2013).  "'A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers,' and a 'practice is deceptive if it has the capacity or tendency to deceive.'"  *Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 91, 747 S.E.2d 220, 228 (2013) (internal citations omitted).  An act or practice "is deceptive if it has the capacity or tendency to deceive."  *Ace Chem. Corp. v. DSI Transps.*, 115 N.C. App. 237, 247, 446 S.E.2d 100, 106 (1994) (internal citations omitted).  As the North Carolina Court of Appeals has recognized, unfair competition eludes a precise definition, but "has been referred to in terms

---

[79] Second Am. Compl.  ¶¶ 113-115.
[80] *Id.* at ¶ 117.
[81] *Id.* at ¶ 118.

of conduct 'which a court of equity would consider unfair.'" *Harrington Mfg. Co. v. Powell Mfg. Co.*, 38 N.C. App. 393, 400, 248 S.E.2d 739, 744 (1978) (internal citations omitted). Whether an act or practice is unfair or deceptive is a question of law for the Court. *Songwooyarn Trading Co. v. Sox Eleven, Inc.*, 213 N.C. App. 49, 56, 714 S.E.2d 162, 167 (2011).

57.     As a preliminary matter, the Court already has held that there is no evidence that Defendants used or benefited from any of the alleged trade secret or confidential information that Crecelius or others may have acquired and temporarily possessed. Accordingly, Plaintiffs cannot establish that it was injured by such acquisition and possession, and a claim for unfair and deceptive practices based on this allegation fails.[82] Similarly, the Court concluded that Crecelius did not interfere with the Confidentiality and Non-Solicitation Agreements between Do Good and the agents, and Plaintiffs cannot establish a claim for unfair trade practices based on such alleged interference. The Court concludes that Defendants' Motion as to Plaintiffs' claims for violation of G.S. § 75-1.1 based on this conduct should be GRANTED.

58.     Plaintiff also claims that Crecelius' engaged in unfair and deceptive practices during the negotiation over the Separation Agreement by failing to disclose or concealing that the agents were going to leave Do Good. The Court already has concluded that Crecelius' failure to disclose what he knew about the agents' intentions could constitute a fraud and a breach of his fiduciary duty. Defendants' contend, however, that Crecelius' conduct was purely internal to Do Good and was not "in or affecting commerce." Accordingly, Crecelius' failure to disclose could not be a violation of G.S. § 75-1.1. Plaintiffs contend that during the

---

[82] The Court of Appeals has recognized that "violations of section 66-152 may also violate section 75-1.1.," *Ge Betz*, 231 N.C. App. at 236, 752 S.E.2d at 650, but a plaintiff must satisfy all three elements of an unfair practice claim, including showing injury, in order to sustain a claim under G.S. § 75-1.1. *Id*.

negotiations Crecelius was acting both in his individual capacity and as an agent for RCWIL/Nest Realty, and that this removes his conduct from that which was only internal to Do Good. The Court must decide whether the alleged conduct was "in or affecting commerce."

59. In *White v. Thompson*, 364 N.C. 47, 53, 691 S.E.2d 676, 680 (2010), the North Carolina Supreme Court held:

> Our prior decisions have determined that the General Assembly did not intend for the Act's protections to extend to a business's internal operations . . ., the Act is not focused on the internal conduct of individuals within a single market participant, that is, within a single business. To the contrary, the General Assembly intended the Act's provisions to apply to interactions between market participants. As a result, any unfair or deceptive conduct contained solely within a single business is not covered by the Act.

In *White*, the two plaintiffs and defendant Andrew Thompson ("Thompson") formed a partnership to perform maintenance work for a Smithfield Packing Company Inc. ("Smithfield"). The three partners subsequently had disagreements about the business and decided to dissolve the partnership. In the meantime, Thompson had formed a new and separate company and the plaintiffs alleged that Thompson steered some of the partnerships' work for Smithfield and diverted payments for that work to his new company. *Id.* at 49-50, 691 S.E.2d at 677-78. The plaintiffs sued Thompson for, inter alia, breach of fiduciary duty and unfair and deceptive practices. *Id.* at 50, 691 S.E.2d at 678. The jury determined that Thompson had breached his fiduciary duty to the plaintiffs, the trial court trebled damages pursuant to G.S. § 75-16, and Thompson appealed.

60. The Court of Appeals reversed the trial court's award trebling the damages under the UDTPA, holding that Thompson's conduct was not "in or affecting commerce." *Id.* at 51, 691 S.E.2d at 678-79. The Supreme Court affirmed the Court of Appeals, concluding that "[b]ecause . . . Thompson unfairly and deceptively interacted only with his partners, his conduct occurred completely within the [ ] partnership and entirely outside the purview of

the Act." *Id.* at 54, 691 S.E.2d at 681 (emphasis added). The Supreme Court rejected the plaintiffs' argument that Thompson's conduct was in or affecting commerce because it "potentially affected the price Smithfield [ ] would have to pay" for the work, holding that "this argument overlooks that the unfairness of [ ] Thompson's conduct did not occur in his dealings with Smithfield [ ]" but only in his dealings with his partners, and that "the General Assembly did not intend for such conduct to fall within the [UDTPA]'s coverage." *Id.* North Carolina courts have applied the holding and reasoning of *White* to dismiss claims of unfair and deceptive trade practices arising out of other intra-business conduct. *Weaver Inv. Co. v. Pressly Development Assoc.*, 234 N.C. App. 645, 654, 760 S.E.2d 755, 761 (2014) (dismissing UDTPA claim because "defendants' misconduct within the confines of the partnership was not 'in or affecting commerce.'"); *Polyquest, Inc. v. Vestar Corp., LLC*, No. 7:12-CV-23-F, 2014 U.S. Dist. LEXIS 14905 *34-35 (E.D.N.C. February 6, 2014) (dismissing claim brought by one company against another engaged in a joint venture, holding "although Defendants' actions were not confined to the internal operations of a 'single business,' their actions were confined to the internal operation of a 'single market participant,' the joint venture."); *McKee v. James*, 2014 NCBC LEXIS 74, *42 (2014) (dismissing UDTPA claims between members of an LLC because "the undisputed evidence of record does not reveal a dispute between McKee Craft and another business or consumers at large, but rather a dispute between Plaintiffs and James as co-owners of McKee Craft.").

61. The Court concludes that any alleged unfair or deceptive conduct in his case was confined to a single business, or market participant, Do Good. Even if Crecelius breached a fiduciary duty to Do Good by failing to disclose his knowledge about the agents' intentions, Crecelius "unfairly and deceptively interacted" only with Do Good and Jackson, and not with any other market participants. Plaintiffs contend that Crecelius conduct "was not done by a mere partner; it was done by a competitor and its agent" and that Crecelius "was operating

on behalf of that business beginning on August 21."[83]  Plaintiffs imply that this would make the conduct here between RCWIL/Nest and Do Good, and not merely internal to Do Good. The Court is not persuaded by this argument.  In *White*, the defendant's diversion of work opportunities and payments occurred after the defendant had formed and was working on behalf of his new, competing business.  Nevertheless, the Supreme Court held that the defendant's misconduct was not "in or affecting commerce" under the UDTPA.  *White*, 364 N.C.  at 54, 691 S.E.2d at 681.  Accordingly, Defendants' Motion as to Plaintiffs' claim for unfair trade practices in violation of G.S. § 75-1.1 should be GRANTED.

       f.   *Breach of Contract*.

62.     Plaintiffs allege that Crecelius breached the Separation Agreement by failing to transfer exclusive control to "various systems and accounts, including the Dotloop, Highrise and email databases," and the data therein, to Jackson upon executing the Separation Agreement (Seventh Claim for Relief).[84]  The Court already has concluded that issues of material fact exist as to whether Jackson was induced to enter into the Separation Agreement by fraud, therefore making the agreement voidable.  Since the existence of a valid contract is disputed, the Court cannot enter judgment in Defendants' favor on the claim for breach of contract, and Defendants' Motion as to that claim should be DENIED.  *Charlotte Motor Speedway, LLC v. County of Cabarrus*, 230 N.C. App. 1, 6, 748 S.E.2d 171, 175 (2013) ("Plaintiffs' claims for breach of contract . . . necessarily hinge on the threshold issue of whether a valid contract actually existed between them and the County.").

       g.   *Conversion*.

63.     Plaintiffs allege that Defendants wrongfully converted Do Good's "proprietary and trade secrets information" contained in the Highrise database by altering Do Good's

---

[83] Pl.'s Br Opp. Mot. Summ. J. p. 24.
[84] Second Am. Comp. ¶¶ 121-123.

"exclusive dominion and authority over that property" (Eleventh Claim for Relief).[85] Plaintiff, however, makes scant argument in support of this claim in its brief, and cites no precedent in support of its position.

64. Under North Carolina law, conversion is "the unauthorized assumption and exercise of the right of ownership over the goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 309, 603 S.E.2d 147, 165 (2004). "The general rule is that there is no conversion until some act is done which is a denial or violation of the plaintiff's dominion over or rights in the property." *Id.; Lake Mary Ltd. Part. v. Johnston*, 145 N.C. App. 525, 531-32, 551 S.E.2d 546, 552 (2001) ("The essence of conversion is not the acquisition of property by the wrongdoer, but the *wrongful deprivation* of it to the owner.") (emphasis added; citation omitted).

65. "Where there has been no wrongful taking or disposal of the goods, and the defendant has merely come rightfully into possession and then refused to surrender them, demand and refusal are necessary to the existence of the tort." *White*, 166 N.C. App. 283, 310-311, 603 S.E.2d 147, 165 (internal citations omitted); *Levin v. Jacobson*, 2015 NCBC LEXIS 111, **28-29 (N.C. Super. Ct. 2015). Upon the making of a required demand, the "absolute, unqualified refusal to surrender . . . is of course a conversion." *Hoch v. Young*, 63 N.C. App. 480, 483, 305 S.E.2d 201, 203 (1983) (internal citations omitted).

66. In this case, Crecelius made a copy of the Highrise database while he was still a member, manager, and officer of Do Good. Accordingly, Crecelius came "rightfully into possession" of the information. In addition, Crecelius did not delete the information from Do Good's systems or otherwise deprive Plaintiffs of access to and use of the information in

---

[85] Second Am. Compl. ¶¶ 144-150.

Highrise. Finally, it is undisputed that when Jackson made demand, Crecelius returned the information. The Court concludes that based on these undisputed facts, Plaintiffs' claim for conversion must fail.

67. Alternatively, this Court previously has concluded that making a copy of electronically-stored information which does not deprive the plaintiff of possession or use of information, does not support a claim for conversion. *RoundPoint Mortg. Co. v. Florez*, 2016 NCBC LEXIS 18, *55 (N.C. Super. Ct. 2016) (denying a conversion claim because the plaintiff did not allege to have been deprived of access or excluded from the use of electronic information that it claimed was converted); *Horner Int'l Co. v. McKoy*, 2014 NCBC LEXIS 68, **8-9 (N.C. Super. Ct. 2014). Therefore, Defendants' Motion regarding Plaintiffs' claim for conversion should be GRANTED.

   h. *Punitive Damages*.

68. "To prevail on a claim for punitive damages, Plaintiff[] must succeed on a claim for compensatory damages, and prove by clear and convincing evidence that one or more of the following aggravating factors were present: (a) fraud, (b) malice, or (c) willful or wanton conduct." *BOGNC, LLC v. Cornelius NC Self-Storage, LLC*, 2013 NCBC LEXIS 22, *1 (N.C. Super. Ct. 2013). Since the Court has not granted Defendants motion for summary judgment as to all of Plaintiffs' causes of action that involve the potential recovery of compensatory damages that would support a claim for punitive damages, Defendants' Motion for Summary Judgment as to Plaintiffs' claim for punitive damages must be DENIED at this stage. *See Id.*

i. *Unjust Enrichment*.

69. For a Twelfth Claim for Relief, Plaintiffs seek a remedy for unjust enrichment in the alternative to their breach of contract claim, alleging that Defendants obtained the benefits of the databases and other confidential information developed by Do Good.[86]

> In North Carolina, to recover on a claim of unjust enrichment, Plaintiff must prove: (1) that it conferred a benefit on another party; (2) that the other party consciously accepted the benefit; and (3) that the benefit was not conferred gratuitously or by an interference in the affairs of the other party. *Shelter Corp. v. BTU, Inc.*, 154 N.C. App. 321, 330, 572 S.E.2d 200 (2002). "A claim of this type is neither in tort nor contract but is described as a claim in quasi contract or a contract implied in law." *Booe v. Shadrick*, 322 N.C. 567, 570, 369 S.E.2d 554 (1988). "The doctrine of unjust enrichment was devised by equity to exact the return of, or payment for, benefits received under circumstances where it would be unfair for the recipient to retain them without the contributor being repaid or compensated." *Collins v. Davis*, 68 N.C. App. 588, 591, 315 S.E.2d 759 (1984).

*Koch Measurement Devices, Inc. v. Armke*, 2015 NCBC LEXIS 45, *30 (N.C. Super. Ct. 2015). Plaintiffs must allege and prove that they actually conferred a benefit on Defendants, not that Defendants received a benefit which Plaintiffs did not intend for them to receive. *Sellers v. Morton*, 191 N.C. App. 75, 84, 661 S.E.2d 915, 923 (2008).

70. Plaintiffs argue that Defendants' allegedly tortious conduct benefited Defendants at their expense. In particular, Plaintiffs claim that Defendants were unjustly enriched to the extent that Defendants utilized confidential Do Good information to further the growth of Nest Realty in the Wilmington community. Plaintiffs, however, have failed to offer any evidence to rebut Defendants' position that they did not use any information from Highrise, or any other confidential Do Good information, and have received no measurable benefit by gaining access to Do Good's confidential information. For example, Plaintiffs do not even contend that Defendants have made a sale as a result of confidential information obtained from Do Good. In fact, Plaintiffs present no evidence that calls into question the

---

[86] Second Am. Compl. ¶¶ 151 – 155.

fact that Defendants made a concerted effort to distance themselves from Highrise after Plaintiffs commenced this lawsuit. Since Plaintiffs have failed to present evidence that Defendants gained any measurable benefit from Do Good's information, the Court concludes that Defendants Motion for Summary Judgment on Plaintiffs' claim for unjust enrichment should be GRANTED.

        *j.*   <u>*Rescission*</u>.

71.     Plaintiffs claim that the material and substantial breach of contract and Crecelius' false and fraudulent representations and failures to disclose information material to the Separation Agreement allow them to rescind the contract (Thirteenth Claim for Relief).[87] The Court of Appeals has summarized the remedy of rescission as follows:

> When a party has been fraudulently induced to enter a sale, the remedies are either to repudiate the contract or affirm the contract and recover damages caused by the fraud. The plaintiff may elect one or the other but may not seek rescission and maintain an action for fraud. However, the purpose of the doctrine of election of remedies is not to prevent recourse to any remedy, but to prevent double redress for a single wrong. The rule is, if rescission of the contract does not place the injured party *in status quo*, as where he has suffered damages which cancellation of the contract cannot repair, there is no principle of law which prevents him from maintaining his action for damages caused by the other party's fraud.

*Collier v. Bryant*, 216 N.C. App. 419, 434, 719 S.E.2d 70, 82 (2011) (emphasis in original; internal citations and quotations omitted). In North Carolina, "the common law doctrine of rescission is equivalent to 'revocation of acceptance.'" *Prichard Enters. v. Adkins*, 858 F. Supp. 2d 576, 590 (E.D.N.C. 2012) (quoting *Riley v. Ken Wilson Ford, Inc.*, 109 N.C. App. 163, 173, 426 S.E.2d 717, 724 (1993)).

72.     Since the Court has not granted Defendants' Motion for Summary Judgment as to Plaintiffs' fraud, fraud in the inducement, breach of fiduciary duty, and constructive fraud claims, Plaintiffs still may be entitled to elect to rescind the Separation Agreement.

---

[87] Second Am. Compl. ¶¶ 156-159.

Defendants' Motion for Summary Judgment as to Plaintiffs' claim for rescission should be DENIED.

THEREFORE, IT IS ORDERED that:

73. Defendants' Motion as to Plaintiffs' First Claim for Relief is GRANTED.

74. Defendants' Motion as to Plaintiffs' Second Claim for Relief is DENIED.

75. Defendants' Motion as Plaintiffs' Third and Fourth Claims for Relief is GRANTED as to the claims for misrepresentation and failure to disclose/concealment regarding Highrise database and other confidential information. Defendants' motion is DENIED as to the claims for failure to disclose/concealment regarding the intentions of the agents.

76. Defendants' Motion on Plaintiffs' Fifth Claim for Relief is DENIED.

77. Defendants' Motion on Plaintiffs' Sixth Claim for Relief is GRANTED.

78. Defendants' Motion on Plaintiffs' Seventh Claim for Relief is DENIED.

79. Defendants' Motion as Plaintiffs' Eighth and Ninth Claims for Relief is GRANTED as to the claims based on upon alleged use or disclosure of the Highrise database and other confidential information. Defendants' motion is DENIED as to the claims for failure to disclose/concealment regarding the intentions of the agents.

80. Defendants' Motion on Plaintiffs' Tenth Claim for Relief is DENIED.

81. Defendants' Motion on Plaintiffs' Eleventh Claim for Relief is GRANTED.

82. Defendants' Motion on Plaintiffs' Twelfth Claim for Relief is GRANTED.

83. Defendants' Motion on Plaintiffs' Thirteenth Claim for Relief is DENIED.

84. Except as expressly granted herein, Defendants' Motion is DENIED.

This the 20th day of June, 2016.

/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge
for Complex Business Cases