IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-836

No. COA22-185

Filed 20 December 2022

Wake County, No. 20 CVS 9418

MATTHEW DUFFY, in his individual capacity and, alternatively, in his capacity as officer and shareholder of CAMPSIGHT STRATEGIC COMMUNICATIONS, INC., Plaintiff,

v.

JON CAMP and AMY SCHUSSLER a/k/a AMY JOHNSON, in their individual capacities, and CAMPSIGHT STRATEGIES, LLC, Defendants,

CAMPSIGHT STRATEGIC COMMUNICATIONS, INC., Nominal Defendant.

Appeal by plaintiff from order entered 18 November 2021 by Judge Vince M. Rozier, Jr., in Wake County Superior Court. Heard in the Court of Appeals 23 August 2022.

*Miller Monroe & Plyler, PLLC, by Robert B. Rader, III, and Jason A. Miller, for plaintiff-appellant.*

*Stubbs & Perdue, P.A., by Laurie B. Biggs, for defendants-appellees Jon Camp, Amy Johnson, and CampSight Strategies, LLC.*

ZACHARY, Judge.

¶ 1        Plaintiff Matthew Duffy appeals from the trial court's order denying his motion for summary judgment and granting summary judgment in favor of Defendants Jon

Camp, Amy Johnson, and CampSight Strategies, LLC. After careful review, we affirm in part, reverse in part, and remand.

## I.  Background

In January 2018, Duffy, Camp, and Johnson formed CampSight Strategic Communications, Inc. ("the Corporation"), with each owning an equal share of the Corporation. Although the shareholders never executed corporate bylaws or a shareholder agreement, Camp acted as the Corporation's CEO and Duffy acted as its COO, "as reflected in the [Corporation]'s filings with the North Carolina Secretary of State." The shareholders also decided that Duffy and Camp would equally split the net profits of the Corporation; although Johnson had an ownership stake, she was not employed by and did not receive wages from the Corporation.

About six months to a year after the Corporation was formed, Camp concluded that Duffy "was not performing his job duties." On 27 February 2020, Camp met with Duffy and informed him that Camp no longer wished to be in business with him. Following this meeting, Camp sent Duffy an email restating "the options [Camp] proposed":

> 1. You stay on as a CampSight employee. I either pay you a $40k/yr salary with incentives or a flat $50k/yr salary. Incentives would be a percentage of business brought in. No healthcare, unfortunately. I agree to take the full tax hit for 2020.
>
> 2. You fire up Duffy Media and I hire you on as a

contractor. We keep working together on projects, with pay.. [sic] TBD. Could be hourly. Could be we split projects 50/50 like we, [sic] been doing. Could be you wind up lead in the job and pay me. Here, too, I'll take the 2020 tax hit.

3. We go our separate ways. You either just leave me CampSight or we dissolve it and wish each other well.

¶ 4   From that day on, Duffy was no longer involved in the day-to-day operations of the Corporation. Communication between the parties ceased for a few weeks; Camp asserts that during this time he nonetheless "repeatedly requested" that Duffy share his "intentions and interests regarding continuing work for the [Corporation] or for direction on the [Corporation]'s future." On 19 March 2020, Duffy's counsel sent Camp and Johnson a letter addressing their actions and "requesting an amicable resolution of Duffy's ownership interest in" the Corporation.

¶ 5   The next day, Camp began notifying the Corporation's clients that he "decided to start working under a new LLC[,]" and once he obtained an IRS Employer Identification Number for CampSight Strategies, LLC ("the New Entity"), he began sharing it with the clients as well. Camp also informed the clients that they would need to execute new contracts with the New Entity, and in response to one client's question about canceling purchase orders from the Corporation, Camp replied: "That would be great. Thanks." Camp additionally instructed the client that the "end date of the previous contract" was 1 March 2020. Camp and Johnson officially formed the

New Entity on 2 April 2020.

¶ 6     On 29 April 2020, Duffy demanded in writing that the Corporation, Camp, and Johnson take immediate action against the New Entity to recover damages for violations of the Corporation's rights and to seek any necessary emergency injunctive relief. *See* N.C. Gen. Stat. § 55-7-42 (2021) (requiring that a shareholder make a written demand upon a corporation as a prerequisite to the filing of a derivative proceeding). Defendants rejected Duffy's demand by letter dated 4 June 2020.

¶ 7     On 21 August 2020, Duffy filed a verified complaint, alleging: (1) breach of fiduciary duty (by Camp as to the Corporation, and by Camp and Johnson "as majority shareholders" as to Duffy "as minority shareholder"); (2) common-law tradename infringement; (3) conversion of corporate assets and opportunities; (4) constructive trust and accounting; (5) civil conspiracy; (6) unjust enrichment; and (7) unfair and deceptive trade practices.[1] Duffy also requested injunctive relief with regard to the tradename infringement claim, and asserted a *Meiselman* claim[2]

---

[1] We note that, although Duffy requested that the trial court impose a constructive trust and order an accounting as a separate claim in his complaint, "a constructive trust is a remedy, not a cause of action, and is merely a procedural device by which a court of equity may rectify certain wrongs." *Musselwhite v. Cheshire*, 266 N.C. App. 166, 181, 831 S.E.2d 367, 378 (2019) (citation and internal quotation marks omitted). Similarly, "[a]n accounting is an equitable remedy sometimes pled in claims of breach of fiduciary duty." *Burgess v. Burgess*, 205 N.C. App. 325, 333, 698 S.E.2d 666, 672 (2010). Accordingly, there is no separate claim for a "constructive trust and accounting" to address; nonetheless, on remand the trial court may elect to impose a constructive trust and order an accounting in the exercise of its equitable power.

[2] *Meiselman v. Meiselman*, 309 N.C. 279, 300–01, 307 S.E.2d 551, 564 (1983).

seeking involuntary dissolution of the Corporation or a mandatory buyout of his minority ownership interest. In the event that the trial court determined that one or more of the previous claims could not be asserted by Duffy in his individual capacity, in the alternative, Duffy asserted all claims derivatively.

¶ 8        On 26 October 2020, Defendants filed their unverified answer, denying Duffy's claims and raising affirmative defenses together with counterclaims for: (1) conversion; (2) breach of fiduciary duty; (3) constructive trust and accounting; and (4) unjust enrichment. On 4 January 2021, Duffy filed his unverified reply to Defendants' counterclaims, generally denying the allegations and setting forth various affirmative defenses.

¶ 9        After conducting discovery, Defendants filed a motion for summary judgment along with a memorandum of law in support of their motion on 1 October 2021. On 14 October 2021, Duffy filed a motion for summary judgment, followed by a memorandum of law in support of his motion. The parties' motions for summary judgment came on for hearing in Wake County Superior Court on 17 November 2021. The next day, the trial court entered an order granting Defendants' motion, denying Duffy's motion, and dismissing all claims against Defendants with prejudice. Defendants' counterclaims remained pending.

¶ 10        The trial court certified its order as a final judgment pursuant to N.C. Gen. Stat. § 1A-1, Rule 54(b), determining that "there is no just reason for delay." Duffy

timely filed notice of appeal.

## II. Appellate Jurisdiction

¶ 11          "Not every judgment or order of the Superior Court is appealable . . . . Indeed, an appeal can be taken only from such judgments and orders as are designated by the statute regulating the right of appeal." *Veazey v. City of Durham*, 231 N.C. 357, 362, 57 S.E.2d 377, 381*, reh'g denied*, 232 N.C. 744, 59 S.E.2d 429 (1950). This Court principally entertains appeals from final judgments. *See* N.C. Gen. Stat. § 7A-27(b)(1)–(2). "A final judgment is one which disposes of the cause as to all the parties, leaving nothing to be judicially determined between them in the trial court." *Veazey*, 231 N.C. at 361–62, 57 S.E.2d at 381. By contrast, "[a]n interlocutory order is one made during the pendency of an action, which does not dispose of the case, but leaves it for further action by the trial court in order to settle and determine the entire controversy." *Id.* at 362, 57 S.E.2d at 381. Because an interlocutory order is not yet final, with few exceptions, "no appeal lies to an appellate court from an interlocutory order or ruling of the trial judge[.]" *N.C. Consumers Power, Inc. v. Duke Power Co.*, 285 N.C. 434, 437, 206 S.E.2d 178, 181 (1974).

¶ 12          Nevertheless, an interlocutory order may be immediately appealed if "the order affects some substantial right and will work injury to [the] appellant if not corrected before appeal from final judgment[,]" *Goldston v. Am. Motors Corp.*, 326 N.C. 723, 726, 392 S.E.2d 735, 736 (1990) (citation omitted); *see also* N.C. Gen. Stat.

§§ 1-277(a), 7A-27(b)(3)(a), or if "the trial court certifies, pursuant to [N.C. Gen. Stat.] § 1A-1, Rule 54(b), that there is no just reason for delay of the appeal[,]" *Turner v. Hammocks Beach Corp.*, 363 N.C. 555, 558, 681 S.E.2d 770, 773 (2009); *see also* N.C. Gen. Stat. § 1A-1, Rule 54(b).

¶ 13    "Certification under Rule 54(b) permits an interlocutory appeal from orders that are final as to a specific portion of the case, but which do not dispose of all claims as to all parties." *Duncan v. Duncan*, 366 N.C. 544, 545, 742 S.E.2d 799, 801 (2013). Rule 54(b) provides, in relevant part:

> When more than one claim for relief is presented in an action, . . . or when multiple parties are involved, the court may enter a final judgment as to one or more but fewer than all of the claims or parties only if there is no just reason for delay and it is so determined in the judgment. Such judgment shall then be subject to review by appeal or as otherwise provided by these rules or other statutes.

N.C. Gen. Stat. § 1A-1, Rule 54(b).

¶ 14    Thus, proper certification of an interlocutory order pursuant to Rule 54(b) requires:

> (1) that the case involve multiple parties or multiple claims; (2) that the challenged order finally resolve at least one claim against at least one party; (3) that the trial court certify that there is no just reason for delaying an appeal of the order; and (4) that the challenged order itself contain this certification.

*Asher v. Huneycutt*, 2022-NCCOA-517, ¶ 14.

¶ 15    In the instant case, the trial court's order granting summary judgment in favor of Defendants is interlocutory, as it resolved all claims against Defendants but did not dispose of Defendants' counterclaims against Duffy. *See Veazey*, 231 N.C. at 362, 57 S.E.2d at 381. Nevertheless, the trial court's Rule 54(b) certification is effective to vest jurisdiction in this Court: at the time of the order, the case involved multiple parties with multiple claims and counterclaims; the order on appeal finally resolved all claims against Defendants; the trial court certified that "there is no just reason for delay"; and Duffy appealed from the order containing this certification. *See Asher*, ¶ 14.

¶ 16    Accordingly, this Court has jurisdiction over Duffy's appeal, and we proceed to the merits of his arguments.

### III.    Discussion

¶ 17    On appeal, Duffy argues that the trial court erred by granting Defendants' motion for summary judgment and denying his motion for summary judgment. For the following reasons, we reverse the trial court's entry of summary judgment in favor of Defendants with respect to Duffy's derivative claims of: (1) Camp's breach of fiduciary duty to the Corporation; (2) unjust enrichment; (3) unfair and deceptive trade practices; and (4) civil conspiracy. We affirm the trial court's grant of summary judgment on the remaining claims and remand to the trial court for further proceedings.

## A. Standard of Review

The "standard of review of an appeal from summary judgment is de novo; such judgment is appropriate only when the record shows that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." *In re Will of Jones*, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008) (citation and internal quotation marks omitted).

> When considering a motion for summary judgment, the trial judge must view the presented evidence in a light most favorable to the nonmoving party. If the movant demonstrates the absence of a genuine issue of material fact, the burden shifts to the nonmovant to present specific facts which establish the presence of a genuine factual dispute for trial.

*Id.* (citation and internal quotation marks omitted).

## B. Analysis

Duffy contends that the trial court erred by granting Defendants' motion for summary judgment and denying his motion for summary judgment. We address the trial court's ruling as to each of Duffy's claims in turn.

### 1. Direct or Derivative Claims

As an initial matter, we note that Duffy has "asserted, in the alternative," each claim "of the [c]omplaint on the [Corporation]'s behalf against Camp, Johnson, and

the New Entity"; that is, Duffy has alternatively asserted derivative claims.[3] "A derivative proceeding is a civil action brought by a shareholder in the right of a corporation, while an individual action is one a shareholder brings to enforce a right which belongs to him personally." *Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C. App. 390, 395, 537 S.E.2d 248, 253 (2000) (citation and internal quotation marks omitted), *disc. review denied*, 353 N.C. 378, 547 S.E.2d 14 (2001); *accord* N.C. Gen. Stat. § 55-7-40.1. "It is not always easy to distinguish between a right of the corporation and a right belonging to an individual shareholder. The same wrongful conduct can give rise to both derivative and direct individual claims, for which courts have sometimes allowed shareholders to maintain derivative and direct actions simultaneously." *Norman*, 140 N.C. App. at 395, 537 S.E.2d at 253 (citation and internal quotation marks omitted).

¶ 21    "As a general rule, shareholders have no right to bring actions in their individual names to enforce causes of action accruing to the corporation, but must assert such claims derivatively . . . ." *Id.* (citation and internal quotation marks omitted); *see also Corwin v. British Am. Tobacco PLC*, 371 N.C. 605, 612, 821 S.E.2d 729, 734 (2018) ("[S]hareholders generally may not bring individual actions to recover

---

[3] It is undisputed that Duffy has "complied with all applicable statutory requirements and conditions precedent" and "has proper standing to assert derivative claims on behalf of" the Corporation. *See* N.C. Gen. Stat. §§ 55-7-40 to -42.

what they consider their share of the damages suffered by a corporation." (citation omitted)), *reh'g denied*, 372 N.C. 53, 822 S.E.2d 648 (2019). "There are two exceptions to this general rule: shareholders may bring an individual action when (1) the wrongdoer owed them a special duty or (2) they suffered a personal injury distinct from the injury sustained by the corporation itself." *Corwin*, 371 N.C. at 612, 821 S.E.2d at 734 (citation and internal quotation marks omitted).

¶ 22    "The first exception applies when the wrongdoer owes a duty that is personal" to the plaintiff as a shareholder, "separate and distinct from the duty" that the defendant owes to the corporation, "such as a fiduciary duty owed to the stockholders." *Id.* (citation and internal quotation marks omitted). For the reasons discussed in Section III.B.2.b below, Defendants Camp and Johnson, as majority shareholders, did not owe a special fiduciary duty to Duffy as minority shareholder. Accordingly, Duffy may not avail himself of this exception to the general rule.

¶ 23    "The second . . . exception applies when a plaintiff suffers an injury that is distinct from the injury suffered by the corporation itself." *Id.* at 612, 821 S.E.2d at 735 (citation and internal quotation marks omitted). As discussed below, this exception does not apply to any of the claims for which summary judgment was inappropriate. Therefore, on remand, the trial court is to consider Duffy's surviving claims as comprising a derivative action, rather than an individual suit.

### 2. *Fiduciary Duty*

¶ 24        Duffy first argues that Camp and Johnson breached their fiduciary duties: Camp breached the fiduciary duty that he owed to the Corporation, and Camp and Johnson, as "majority shareholders," breached the fiduciary duty that they owed to Duffy, as the "minority shareholder." The legal and factual issues at play in each of these two claims differ.

### a. Camp's Fiduciary Duty to the Corporation

¶ 25        There is no dispute that Camp, as the Corporation's CEO, owed fiduciary duties of loyalty and due care to the Corporation. Duffy contends that "Camp breached his fiduciary duties of loyalty and due care when he contacted existing clients of the [Corporation] . . . to divert certain business of the [Corporation] to the benefit of himself and the New Entity." Notably, however, Duffy "alleges no breach of fiduciary duty owed to him personally in his capacity as a shareholder" and consequently, "the claim is entirely derivative[.]" *Allen v. Ferrera*, 141 N.C. App. 284, 292, 540 S.E.2d 761, 767 (2000).

¶ 26        Under the North Carolina Business Corporation Act, a corporate officer with discretionary authority must discharge his duties:

> (1) In good faith;
>
> (2) With the care an ordinarily prudent person in a like position would exercise under similar circumstances; and
>
> (3) In a manner he reasonably believes to be in the best interests of the corporation.

N.C. Gen. Stat. § 55-8-42(a); *see also Seraph Garrison, LLC v. Garrison*, 247 N.C. App. 115, 119, 787 S.E.2d 398, 403 (2016). "[C]orporate directors and officers act in a fiduciary capacity in the sense that they owe the corporation the duties of loyalty and due care." *Seraph Garrison*, 247 N.C. App. at 119, 787 S.E.2d at 403. Section 55-8-42(a)(3) "codifies the requirement that an officer always discharge the responsibilities of the office with undivided loyalty to the corporation. The corporate law duty of loyalty also imposes an affirmative obligation: a fiduciary must strive to advance the best interests of the corporation." *Id.* at 120, 787 S.E.2d at 403–04 (citation and internal quotation marks omitted).

¶ 27    Camp raises several arguments in his defense; principally, he argues that his fiduciary duty to the Corporation ceased prior to the conduct of which Duffy complains. Camp offers two points in time at which he contends that his fiduciary duty to the Corporation ceased: (1) when he resigned as an officer of the Corporation as a result of the 27 February 2020 meeting; and (2) when Duffy retained counsel. However, when viewed in the light most favorable to Duffy under our standard of review, *In re Will of Jones*, 362 N.C. at 573, 669 S.E.2d at 576, genuine issues of material fact exist as to whether and when Camp's fiduciary duty to the Corporation ceased.

¶ 28    As to the meeting, Camp asserts that "[i]t is undisputed that on February 27, 2020, Camp met with Duffy and told him he no longer wished to be in business with

him, and that three options for moving forward with the business were presented, including closing down" the Corporation. Duffy maintains that this establishes merely that "Camp sought to terminate his relationship with Duffy" rather than the Corporation. As Duffy explains, "[t]he meeting pertained to Camp's proposed termination of Duffy as an owner of the [Corporation], not Camp's termination of himself as an officer of the [Corporation]." Moreover, Duffy notes that, in their brief on appeal, Defendants assert only that "the undisputed facts show that Camp sought to terminate his relationship *with Duffy*[.]" (Emphasis added). Indeed, in their reply to Duffy's interrogatories, Defendants explained:

> Defendant Camp spoke with [Duffy] on February [27], 2020 about options for moving forward with the [Corporation] – either closing down the [Corporation] and they would go their separate ways or changing the structure of the [Corporation], whereby [Duffy] would be a salaried employee at a rate of $50,000.00. [Duffy] never responded. As a result, [Defendant] Camp established a new company to continue earning a living.

¶ 29 The options that Camp presented to Duffy suggest that Camp would remain in some official capacity with the Corporation, rather than evidence Camp's resignation:

> 1. You stay on as a CampSight employee. I either pay you a $40k/yr salary with incentives or a flat $50k/yr salary. Incentives would be a percentage of business brought in. No healthcare, unfortunately. I agree to take the full tax hit for 2020.
>
> 2. You fire up Duffy Media and I hire you on as a contractor. We keep working together on projects,

> with pay.. [sic] TBD. Could be hourly. Could be we
> split projects 50/50 like we, [sic] been doing. Could
> be you wind up lead in the job and pay me. Here, too,
> I'll take the 2020 tax hit.
>
> 3.  We go our separate ways. You either just leave me
>     CampSight or we dissolve it and wish each other
>     well.

¶ 30    On appeal, Camp asserts that he "believed he had terminated his duties with the [Corporation] by resigning when Duffy failed to respond to him." However, as Duffy correctly observes, "the only mention of any resignation in the record is a single allegation" found in Defendants' unverified answer, in which Defendants allege that Camp intended his cessation of "all activities on behalf of" the Corporation to be "his own resignation from" the Corporation. This assertion is not otherwise supported by the record on appeal. To the extent that the trial court relied on this allegation, raised only in Defendants' unverified pleading, this was improper. *See 21st Mtge. Corp. v. Douglas Home Ctr., Inc.*, 187 N.C. App. 770, 775, 655 S.E.2d 423, 425–26 (2007) (reversing and remanding the trial court's grant of the defendants' motion for summary judgment "based on the [defendants'] unverified pleading").

¶ 31    Thus, viewed in the light most favorable to Duffy, *In re Will of Jones*, 362 N.C. at 573, 669 S.E.2d at 576, the record does not contain sufficient evidence to definitively establish that Camp had resigned his position as an officer of the Corporation, thereby terminating any fiduciary duty to the Corporation.

¶ 32    Camp further alleges that his fiduciary duty to the Corporation ceased when Duffy hired counsel after the 27 February meeting. Defendants cite *Piedmont Institute of Pain Management v. Staton Foundation*, 157 N.C. App. 577, 581 S.E.2d 68, *disc. review denied*, 357 N.C. 507, 587 S.E.2d 672 (2003), for the proposition that it is "well established that fiduciary relationships usually terminate when a party hires counsel because of the adversarial relationship that exists between the parties." In *Piedmont*, this Court affirmed summary judgment where the nonmovant-beneficiaries did "not present[ ] any evidence creating a genuine issue of material of fact with respect to the absence of the adversarial nature of their relationship with [the movant-trustee] during the relevant time[.]" 157 N.C. App. at 583–84, 581 S.E.2d at 73.

¶ 33    The North Carolina Business Court has distinguished *Piedmont* and other non-corporate cases that similarly determined that a fiduciary duty was terminated when one party hired counsel.[4] In *RCJJ, LLC v. RCWIL Enterprises, LLC*, the Business Court noted that the adversarial-relationship reasoning of those non-

---

[4] Although "[t]he North Carolina Business Court is a special Superior Court, the decisions of which have no precedential value in North Carolina[,]" *Bottom v. Bailey*, 238 N.C. App. 202, 212, 767 S.E.2d 883, 889 (2014) (citation and internal quotation marks omitted), this Court has recognized that "the Business Court exists solely to hear complex business cases, and as such [we] are respectful of its opinions" to the extent that they may prove to be persuasive authority, *Goldstein v. Am. Steel Span, Inc.*, 181 N.C. App. 534, 536 n.2, 640 S.E.2d 740, 742 n.2 (2007).

corporate cases does not readily extend to cases involving fiduciary relationships arising in the "corporate fiduciary setting":

> [W]hile a trustee owes a fiduciary duty directly to the beneficiary, and spouses owe a duty to one another, a manager owes a fiduciary duty not to the other member or members with whom he may be in an adverse negotiation, but to the LLC. This makes the reasoning behind those cases relieving a trustee or spouse of fiduciary duties when engaged in adversarial negotiations an uneasy fit in the corporate fiduciary setting.

2016 NCBC 44, ¶ 37, 2016 WL 3850403, at *9 (N.C. Super. June 20, 2016). The *RCJJ* Court's examples of spousal and trustee-beneficiary fiduciary duties are consonant with our Supreme Court's recognition that the "characteristics of a fiduciary relationship are readily apparent, for example, in the relationship of spouses . . . and trustee and beneficiary[.]" *Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 367, 760 S.E.2d 263, 266 (2014) (citations omitted).

¶ 34 Furthermore, in *Piedmont* (but unlike the case at bar), there was no dispute that the movant-appellee "had repudiated his fiduciary duties." 157 N.C. App. at 583, 581 S.E.2d at 73. In *RCJJ*, the Business Court found it "significant . . . that the cases holding that a fiduciary duty can be extinguished in an adversarial setting . . . did not hold that the fiduciary was relieved of his duties merely because the parties had retained attorneys or were negotiating over a separation of interests." 2016 NCBC 44, ¶ 38, 2016 WL 3850403, at *10. The Business Court thus focused on the nature of

the relationship between the parties as a more critical factor than the mere retention

of counsel in analyzing the termination of a corporate fiduciary's duties:

> Allowing a manager of a limited liability company to be relieved of his fiduciary duties upon entering into adverse negotiations for the sale of his interests in the company would be inconsistent with the nature of those duties. In addition, the appellate decisions do not support the conclusion that the commencement of adversarial negotiations and retention of attorneys relieves a fiduciary of his duties *as a matter of law*. Rather, *there must be a change in the nature of the relationship between the parties* that establishes that *the parties no longer are in a relationship of confidence and trust*, and that fiduciary duties have been repudiated.

*Id.* ¶ 40, 2016 WL 3850403, at *10 (emphases added).

¶ 35        We find this analysis persuasive in the corporate setting presented in the

instant case. Accordingly, Camp's reliance on *Piedmont* in support of his contention

that his fiduciary duty ceased *as a matter of law* upon Duffy's retention of counsel is

misplaced.

¶ 36        Our appellate courts do not appear to have yet addressed this question; the

Business Court in *RCJJ* described it as an issue of first impression. *Id.* ¶ 35, 2016

WL 3850403, at *8. Nonetheless, we need not resolve this question because here, the

issue of whether Camp's fiduciary duty to the Corporation ceased—and, if so, when—

presents a mixed question of law and fact, for which summary judgment would only

be appropriate "if there are no genuine issues of material fact." *Stratton v. Royal Bank*

*of Canada*, 211 N.C. App. 78, 81, 712 S.E.2d 221, 226 (2011).

¶ 37        In the case at bar, there *are* genuine issues of material fact: if, and when, there was "a change in the nature of the relationship between the parties that establishe[d] that the parties no longer [we]re in a relationship of confidence and trust," and whether "fiduciary duties ha[d] been repudiated." *RCJJ*, 2016 NCBC 44, ¶ 40, 2016 WL 3850403, at *10.

¶ 38        Further, assuming, *arguendo*, that an adversarial relationship existed at the time of the 19 March letter from Duffy's counsel, Duffy observes that the adversarial relationship would have been between Duffy, Camp, and Johnson as shareholders, and not between Camp and the Corporation. Duffy retained counsel to represent him, in his individual capacity, rather than to represent the interests of the Corporation. Therefore, Duffy's retention of counsel to resolve the issue of compensation for his ownership stake in the Corporation cannot, in and of itself, support Defendants' adversarial-relationship argument.

¶ 39        In sum, summary judgment is inappropriate on Duffy's derivative claim that Camp breached his fiduciary duty to the Corporation because Camp has not shown that his fiduciary duty ceased as a matter of law either (1) as a result of the 27 February meeting, or (2) upon Duffy's retention of counsel. Accordingly, the trial court's order must be reversed as to this derivative claim.

   b.  *Camp's and Johnson's Fiduciary Duty to Duffy*

¶ 40        Duffy also argues that Camp and Johnson, as the "majority shareholders of the closely[ ]held" Corporation, owed a fiduciary duty to Duffy, as the minority shareholder. We disagree.

¶ 41        It is axiomatic that "[f]or a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001). Our appellate courts have defined a fiduciary relationship "as one in which there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence[.]" *Id.* (citation and internal quotation marks omitted). This definition "extends to any possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side, and *resulting domination and influence on the other*." *Id.* at 651, 548 S.E.2d at 707–08 (citation omitted).

¶ 42        "North Carolina recognizes two types of fiduciary relationships: *de jure*, or those imposed by operation of law, and *de facto*, or those arising from the particular facts and circumstances constituting and surrounding the relationship." *Hager v. Smithfield E. Health Holdings, LLC*, 264 N.C. App. 350, 355, 826 S.E.2d 567, 571, *disc. review denied*, 373 N.C. 253, 835 S.E.2d 446 (2019). There is no allegation of a *de jure* fiduciary relationship between Duffy, Camp, and Johnson, so we must determine whether "the particular facts and circumstances constituting and surrounding the[ir] relationship" as the three shareholders of the Corporation gave

rise to a *de facto* fiduciary relationship. *Id.*

¶ 43    "As a general rule, shareholders do not owe a fiduciary duty to each other or to the corporation. However[,] this rule is not without exception. In North Carolina, it is well established that a controlling shareholder owes a fiduciary duty to minority shareholders." *Freese v. Smith*, 110 N.C. App. 28, 37, 428 S.E.2d 841, 847 (1993) (citation omitted). "Once a minority shareholder challenges the actions of the majority, the burden shifts to the majority to establish the fairness and good faith of its actions." *Id.*

¶ 44    The circumstances under which multiple minority shareholders combine into majority or controlling shareholders for the purposes of this *de facto* fiduciary duty rule is something of an open question in North Carolina. *See Corwin*, 371 N.C. at 616, 821 S.E.2d at 737 ("This Court has never held that a *minority* stockholder owes fiduciary duties to other stockholders, but it has also never held that a minority stockholder *cannot* owe fiduciary duties to other stockholders."). The determinative issue is what facts are necessary to elevate the simple majority vote of the minority shareholders in a closely held corporation into a situation of "*domination and influence*" over the outvoted minority shareholder. *Dalton*, 353 N.C. at 651, 548 S.E.2d at 708 (citation omitted).

¶ 45    Duffy relies in part on *Norman* for the proposition that "majority shareholders in a close corporation owe a 'special duty' and obligation of good faith to minority

shareholders[,]" and hence that Camp and Johnson owed a fiduciary duty to Duffy. 140 N.C. App. at 407, 537 S.E.2d at 260. *Norman* is inapposite to our analysis of this issue for several reasons.

¶ 46        First, *Norman* arrived at this Court not on a motion for summary judgment—as in the present case—but rather upon the trial court's grant of the defendants' motion to dismiss. *Id.* at 394, 537 S.E.2d at 252. As regards the issue of whether Duffy has shown a genuine issue of material fact concerning whether Camp and Johnson combined into controlling shareholders, this diminishes *Norman*'s value as precedent because "the standard under which orders granting or denying summary judgment motions and the standard under which orders granting or denying dismissal motions are reviewed are not the same[.]" *Prouse v. Bituminous Cas. Corp.*, 222 N.C. App. 111, 116, 730 S.E.2d 239, 242 (2012), *appeal withdrawn*, 366 N.C. 571, 737 S.E.2d 381 (2013). "[T]he essential difference between the manner in which the two types of issues are reviewed on appeal stems from the scope of the factual information that a reviewing court is entitled to consider . . . ." *Id.* Unlike a motion to dismiss, which tests the sufficiency of the facts as pleaded by the nonmovant against the applicable law, "the fundamental purpose of a summary judgment motion . . . is to allow a litigant to test the extent to which the allegations in which a particular claim has been couched have adequate evidentiary support." *Id.* at 116, 730 S.E.2d at 242–43 (citation and internal quotation marks omitted); *see also Singleton v. Stewart*, 280

N.C. 460, 464, 186 S.E.2d 400, 403 (1972) ("[T]he real purpose of summary judgment is to go beyond or to pierce the pleadings and determine whether there is a genuine issue of material fact.").

¶ 47        Additionally, the specific facts presented in *Norman* weaken its precedential value as concerns this issue. The closely held corporation in *Norman* was "a family[-]owned poultry business[,]" and the plaintiffs and individual defendants were all "related to founder Nash Johnson by either blood or marriage." *Norman*, 140 N.C. App. at 393, 537 S.E.2d at 252. This is significant because, as the *Norman* Court explained, "[w]hen the close relationships between the shareholders in a 'family' or closely held corporation tragically break down, the majority shareholders are obviously in a position to exclude the minority shareholders from management decisions, leaving the minority shareholders with few remedies." *Id.* at 404, 537 S.E.2d at 258. As the *Norman* Court observed, N.C. Gen. Stat. § 55-14-30 "allows shareholders to seek dissolution of a corporation and liquidation of its assets when corporate assets are being misapplied or wasted," but "such relief is *not available to shareholders who wish to retain their interests in a family business*[.]" *Id.* at 405, 537 S.E.2d at 259 (emphasis added) (citation and internal quotation marks omitted).

¶ 48        The relationship between the shareholders of the Corporation in the present case is emphatically dissimilar to the relationships in the "family business" described in *Norman*. Further unlike the instant case, the minority-shareholder-plaintiffs in

*Norman* neither invited the majority-shareholder-defendants to purchase their shares, nor did the plaintiffs seek involuntary dissolution of the family business, facts which informed this Court's decision to recognize their individual claims for breach of fiduciary duty. *Id.* Here, Duffy invited Camp and Johnson to negotiate "an amicable resolution of Duffy's ownership interest in" the Corporation, and he asserted a *Meiselman* claim in his complaint, seeking either involuntary dissolution of the Corporation or a mandatory buyout of his minority ownership interest. We thus conclude that *Norman* is inapplicable to the issue before us.

¶ 49        Duffy also relies on *Loy v. Lorm Corp.*, in which this Court reversed the trial court's entry of summary judgment and allowed a minority shareholder to pursue relief against three fellow shareholders who together held a majority interest, served as corporate "directors and officers[,]" were "firmly in control" of the corporation, and had common interests stemming from their related, jointly owned business. 52 N.C. App. 428, 431, 278 S.E.2d 897, 900 (1981). However, the three minority-shareholder-defendants in *Loy* effectively conceded that they collectively owed the minority-shareholder-plaintiff a fiduciary duty as a group of majority shareholders, and instead challenged on appeal the plaintiff's showing that they breached that duty. *Id.* at 432–33, 278 S.E.2d at 901. This Court therefore did not have the opportunity in *Loy* to address the circumstances under which a group of minority shareholders may effectively combine into a controlling majority, thereby giving rise to a *de facto*

fiduciary duty to the remaining minority.

¶ 50 Although our appellate courts have not squarely addressed the standard that a plaintiff must meet in a case such as this, in which two minority shareholders are alleged to have effectively become a controlling majority such that a *de facto* fiduciary duty arises, we note that the Business Court has repeatedly "refused to impose a fiduciary duty on *minority* members that exercise their voting rights by joining together to outvote a third member." *Vanguard Pai Lung, LLC v. Moody*, 2019 NCBC 38, ¶ 40, 2019 WL 2526461, at *7 (N.C. Super. June 19, 2019) (collecting cases). "These decisions underscore the obvious difference between backing a majority coalition and exercising majority control as of right. In the latter situation, it is the imbalance of power inherent in the relationship between majority and minority members that gives rise to a fiduciary duty." *Id.* ¶ 41, 2019 WL 2526461, at *7.

¶ 51 We find this reasoning persuasive and applicable to the case at bar. As Defendants argued in their memorandum of law in support of their motion for summary judgment: "The reason for this rule is simple — any shareholder on the losing side of any issue or vote could simply claim the prevailing shareholders were collectively 'majority shareholders' negating any and every corporate action taken by a majority."

¶ 52 Thus, it appears that the few cases in which a group of minority shareholders were treated collectively as controlling or majority shareholders can be distinguished

from the present case, as Duffy has not shown that Camp and Johnson assumed a position of "domination and influence" over him as the minority shareholder. *Dalton*, 353 N.C. at 651, 548 S.E.2d at 708 (emphasis omitted) (citation omitted). Duffy supports his allegation of Camp and Johnson's control by reference to Defendants' interrogatory responses, indicating that they "decided that the manner in which the [Corporation] was operated would need to change" and "made a final decision that they could no longer partner with" Duffy. However, a single decision is insufficient to elevate this from a simple case of one minority shareholder being outvoted by two other minority shareholders—albeit in a vote of great importance to the complaining minority—into a situation of such "domination and influence" over the minority shareholder (Duffy) by the controlling shareholders (Camp and Johnson), *id.* (emphasis omitted) (citation omitted), that "the imbalance of power inherent in the relationship between majority and minority" gave rise to a fiduciary duty prior to that vote, *Vanguard Pai Lung*, 2019 NCBC 38, ¶ 41, 2019 WL 2526461, at \*7.

¶ 53        Defendants also make persuasive arguments concerning the extent to which Camp and Johnson may be treated as individuals in analyzing their supposed fiduciary duties to Duffy as minority shareholder. With regard to Johnson, Defendants argue that the trial court's order should be affirmed in that "Duffy put forward no evidence that Johnson ever acted as a controlling shareholder." As Defendants observe, at deposition, Duffy "repeatedly acknowledged that Johnson had

no responsibilities on behalf of the [Corporation], held no title, 'wasn't active', and did not participate in financial decisions." (Citations omitted). Duffy explained during his deposition that he and Camp generally served as the "ultimate decision-makers" for the Corporation, with Johnson "[o]ccasionally" participating "in these discussions, but not usually." It is evident that Johnson did not exercise control over, much less dominate, the Corporation or its affairs. Summary judgment therefore was proper as to Johnson on this claim.

¶ 54        With regard to Camp's fiduciary duty to Duffy, Defendants assert that Camp and Duffy "made all of the decisions about the [Corporation] together" and Duffy's "testimony that they made decisions together shows they each had an equal amount of control over" the Corporation. Defendants also observe that "Duffy has not pointed to any evidence of Camp acting on behalf of the [Corporation] without Duffy's involvement, a lack of control over [the Corporation's] affairs, or domination by Camp over the [Corporation]'s decision making." Accordingly, summary judgment was also appropriate as to Camp on this claim.

¶ 55        In short, summary judgment was improper on Duffy's claim that Camp breached his fiduciary duty to the Corporation, but was proper on the controlling shareholder theory advanced by Duffy against Camp and Johnson collectively and individually.

### 3. *Tradename Infringement*

We next address Duffy's claim of common-law tradename infringement. Our Supreme Court has explained that "[t]he fundamental question in cases of trademark or unfair competition . . . is whether the public is being misled and deceived[.]" *Carolina Aniline & Extract Co. v. Ray*, 221 N.C. 269, 273, 20 S.E.2d 59, 61 (1942) (citation omitted). If so, and if the cause is that "a defendant is in effect taking . . . advantage of the [goodwill] and business reputation that a complainant has built up through service or advertising or in any manner regarded as lawful and proper[,]" then the plaintiff may pursue a claim for common-law tradename infringement. *Id.* at 273, 20 S.E.2d at 61–62 (citation omitted).

"A common law claim for trademark infringement under North Carolina law is analyzed under essentially the same standards as a federal Lanham Act claim regarding an unregistered trademark." *Johnson & Morris PLLC v. Abdelbaky & Boes, PLLC*, 2016 NCBC 76, ¶ 13, 2016 WL 5923662, at *4 (N.C. Super. Oct. 11, 2016). "A trademark includes any word, name, symbol, or device used by an individual to identify and distinguish his goods from those manufactured or sold by others and to indicate the source of the goods." *George & Co. LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 392 (4th Cir. 2009) (citation and internal quotation marks omitted). "To establish trademark infringement, a plaintiff must prove that it owns a valid and protectable mark, and that the defendant's use of a reproduction, counterfeit, copy, or colorable imitation of that mark creates a likelihood of confusion." *Id.* at 393

(citation and internal quotation marks omitted). In the present case, the latter requirement concerning the likelihood of confusion is dispositive.

¶ 58    "A likelihood of confusion exists if the defendant's actual practice is likely to produce confusion in the minds of consumers about the origin of the goods or services in question." *Id.* (citation and internal quotation marks omitted). To assess whether such confusion exists, appellate courts "look to how the two parties actually use their marks in the marketplace to determine whether the defendant's use is likely to cause confusion." *Id.* (citation omitted). The United States Court of Appeals for the Fourth Circuit examines nine factors to determine likelihood-of-confusion in trademark infringement cases:

> (1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace; (2) the similarity of the two marks to consumers; (3) the similarity of the goods or services that the marks identify; (4) the similarity of the facilities used by the markholders; (5) the similarity of advertising used by the markholders; (6) the defendant's intent; (7) actual confusion; (8) the quality of the defendant's product; and (9) the sophistication of the consuming public.

*Id.* (citations omitted). However, "[n]ot all of these factors are of equal importance, nor are they always relevant in any given case." *Id.* (citations and internal quotation marks omitted).

¶ 59    Of these factors, "evidence of actual confusion is often paramount in the likelihood of confusion analysis." *Id.* (citations and internal quotation marks omitted).

"Actual confusion can be demonstrated by both anecdotal and survey evidence. Evidence of only a small number of instances of actual confusion may be dismissed as *de minimis*." *Id.* at 398 (citations omitted).

¶ 60        In the instant case, Duffy has offered no evidence that Defendants' actual practice likely produced confusion among customers. Duffy explains that "the mark at issue is 'Campsight' and a variation of the word 'strategy,' specifically 'Campsight Strategic' as used by the [Corporation] and 'CampSight Strategies' as used by the New Entity, Camp, and Johnson." However, as Defendants note, Duffy "presented no survey or other expert testimony" and "presented no anecdotal evidence of third parties expressing confusion." Duffy makes arguments regarding Defendants' "brazen intent . . . to dupe the certain clients of the [Corporation] into thinking the New Entity was an extension and continuation of" the Corporation and offers examples of the "deceptive language and means" by which Defendants allegedly did this, yet offers scant evidence that Defendants' actual practice likely produced confusion among customers.

¶ 61        Duffy references several emails that Defendants sent to the Corporation's clients in order to illustrate "Camp's deceptive description of the New Entity and its relationship to" the Corporation but, as Defendants note, "these emails only show that Camp was using the name CampSight, and not the third party's response to the use of the tradename." Defendants explain that the emails illustrate that, rather than

using deceptive means, "Camp was not attempting to mislead anyone about his relationship with Duffy or the [Corporation] going forward."

¶ 62 Most conclusively for our analysis, however, is Duffy's deposition testimony, which belies his attempt to show actual confusion:

> Q      Okay, and have you talked with anyone since the February meeting about the use of the name CampSight or CampSight Strategies?
>
> A      Aside from my counsel, no.
>
> Q      Okay, have you talked with clients about CampSight Strategies or the CampSight name?
>
> A      No.
>
> Q      Have you talked with anyone in the industry or potential clients about the use of the name CampSight or CampSight Strategies?
>
> A      Not that I recall, no.
>
> Q      Have you used, you personally or you through a new corporation, used either of those names since the February meeting?
>
> A      No.
>
> Q      Okay, has anyone reached out to you and said, oh, I saw this -- I saw [Defendant Camp]'s new company CampSight Strategies, and I thought that was CampSight Strategic Communications?
>
> A      Not that I recall, no.

¶ 63 Duffy's testimony that he was unaware of any actual confusion undercuts this "most important factor" of the likelihood-of-confusion analysis. *Id.* Further, there is

no significant evidence of customer confusion, or the likelihood of confusion, sufficient to overcome this shortcoming as a matter of law. Accordingly, the trial court's grant of summary judgment on Duffy's tradename infringement claim is affirmed.

¶ 64    Duffy also sought injunctive relief in connection with his tradename infringement claim. "The purpose of a preliminary injunction is ordinarily to preserve the *status quo* pending trial on the merits." *A.E.P. Indus., Inc. v. McClure*, 308 N.C. 393, 400, 302 S.E.2d 754, 759 (1983) (citation omitted). "The first stage of the inquiry is . . . whether [the] plaintiff is able to show likelihood of success on the merits." *Id.* at 401, 302 S.E.2d at 760. As we have already discussed, Duffy is unable to show that he is likely to succeed on the merits of his tradename infringement claim. Accordingly, the trial court properly denied Duffy's request for a preliminary injunction, and the trial court's order is affirmed as to this issue as well.

### 4.  *Conversion*

¶ 65    Additionally, Duffy advances a claim for conversion of corporate assets and opportunities. "[T]he tort of conversion is well defined as an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012) (citation and internal quotation marks omitted). "There are, in effect, two essential elements of a conversion claim: ownership in the plaintiff

and wrongful possession or conversion by the defendant." *Id*. Importantly, "only goods and personal property are properly the subjects of a claim for conversion. . . . [I]ntangible interests such as business opportunities and expectancy interests" are not "subject to a conversion claim." *Norman*, 140 N.C. App. at 414, 537 S.E.2d at 264.

¶ 66        Duffy contends that "existing contracts, orders, payments, and assets of the [Corporation] were diverted to and for the benefit of the New Entity, Camp, and Johnson." Defendants respond that these assets are either "business opportunities and expectancy interests," which are not subject to conversion, *id.*, or "contract rights," which are similarly intangible, *Coca-Cola Bottling Co. Consol. v. Durham Coca-Cola Bottling Co.*, 141 N.C. App. 569, 583, 541 S.E.2d 157, 166 (2000), *disc. review denied*, 353 N.C. 370, 547 S.E.2d 433 (2001), and therefore not subject to conversion. To the extent that the property that Duffy alleges was misappropriated includes business opportunities, expectancy interests, and contract rights, summary judgment was appropriate.

¶ 67        We also note that Duffy specifically alleges that "Camp contacted existing clients of the [Corporation], providing them with the New Entity's financial information, and instruct[ed] said clients to refrain from certain payments and billing to the [Corporation] until the New Entity's information [wa]s in place." Duffy further contends that "Camp instruct[ed] that certain completed work be placed under new contracts benefiting the New Entity" and "that existing purchase orders of the

[Corporation] be cance[l]ed." To the extent that these allegations could be construed—in the light most favorable to Duffy, *In re Will of Jones*, 362 N.C. at 573, 669 S.E.2d at 576—as concerning assets beyond ordinary "business opportunities and expectancy interests[,]" *Norman*, 140 N.C. App. at 414, 537 S.E.2d at 264, and instead concerning actual, tangible funds diverted from the Corporation to the New Entity, summary judgment was still appropriate as Duffy has failed to identify specific sums that were allegedly converted, *see Variety Wholesalers,* 365 N.C. at 528, 723 S.E.2d at 750 ("[T]he general rule is that money may be the subject of an action for conversion only when it is capable of being identified and described." (citation and internal quotation marks omitted)); *see also, e.g., Wake Cty. v. Hotels.com, LP*, 235 N.C. App. 633, 653, 762 S.E.2d 477, 490 (affirming the trial court's dismissal of Wake County's conversion claim over "a category of monies allegedly owed" where the county failed to establish "the funds' specific source, specific amount, and specific destination"), *disc. review denied*, 367 N.C. 799, ___ S.E.2d ___ (2014).

¶ 68        For these reasons, in sum, Duffy has not demonstrated that Defendants wrongfully possessed any Corporation assets that "are properly the subjects of a claim for conversion." *Norman*, 140 N.C. App. at 414, 537 S.E.2d at 264. Thus, the trial court's grant of summary judgment on Duffy's conversion claim is affirmed.

### 5. *Unjust Enrichment*

¶ 69        Duffy next asserts a claim of unjust enrichment against Defendants. To make

out a claim for unjust enrichment, the claimant "must allege that property or benefits were conferred on a defendant under circumstances which give rise to a legal or equitable obligation on the part of the defendant to account for the benefits received, but that the defendant has failed to make restitution for the property or benefits." *Id.* at 417, 537 S.E.2d at 266.

¶ 70        In *Norman*, this Court reversed the trial court's grant of a motion to dismiss and revived an unjust enrichment claim where the plaintiff "allege[d] that the defendants breached their fiduciary duties and received benefits for which they have not paid, thereby injuring the [c]ompany and depriving it of such benefits." *Id.* This aptly describes Duffy's claims in the present case: Duffy argues that "existing business belonging legitimately to the [Corporation] was diverted to the benefit and profit of Camp, Johnson, and the New Entity." Duffy reiterates his allegations that Camp instructed clients to refrain from making certain payments or billing the Corporation for completed work, altered existing contracts with the Corporation to divert business to the New Entity, and instructed clients to cancel existing purchase orders with the Corporation.

¶ 71        In addition to those allegations on behalf of the Corporation, Duffy contends that in his individual capacity he "was entitled to share proportionately in such business and assets but was prevented." However, as stated above, "shareholders generally may not bring individual actions to recover what they consider their share

of the damages suffered by a corporation." *Corwin*, 371 N.C. at 612, 821 S.E.2d at 734 (citation omitted). Here, Duffy's asserted direct injury—his proportionate share of the "business and assets" allegedly diverted to the New Entity—is merely his share of the injury suffered by the Corporation. Duffy has thus failed to demonstrate that he "suffer[ed] an injury that is distinct from the injury suffered by the corporation itself" as to this claim, *id.* at 612, 821 S.E.2d at 735 (citation and internal quotation marks omitted), and the claim he advances for unjust enrichment may only proceed derivatively, *see Norman*, 140 N.C. App. at 395, 537 S.E.2d at 253.

¶ 72     In his first set of interrogatories, Duffy asked Defendants to "[i]dentify, with specificity, any and all assets, contracts, clients, customers, property, and/or business opportunities diverted, transferred, and/or assigned to the New Entity from the [Corporation] from April 2, 2020 to present." Defendants answered: "None." Duffy also asked Defendants to "[e]xplain in detail what has occurred with the 2020 work contracts between the [Corporation] and its clients and/or customers since February 28, 2020." Defendants answered:

> In January 2020, the [Corporation] had three pending contracts. Each contract had an agreed upon hourly rate, but work was only to be performed on an as needed basis or project basis when requested by the client. Any requested work in January or February 2020 was performed by Mr. Camp and paid to the [Corporation]. None of the contracts were long term contracts and none of the contracts were exclusive to the [Corporation] as clients could use any service provider other than the [Corporation]

without breaching the terms of the contract. If the client never asked for additional services to be performed, then the [Corporation] was not entitled to any compensation. [One client] contract had a defined project for about $8,000.00 of work. Mr. Camp performed this work at the request of [the client] and [the client] paid approximately $8,000 to [the New Entity].

When Mr. Duffy made it clear he intended to leave the [Corporation], Defendant Camp informed the [Corporation]'s three ongoing clients that the [Corporation] could no longer do business with them. Defendant Camp informed each of them that he and Mr. Duffy would no longer be partners, and that he could not, in good conscience, continue working for them. Each client indicated an interest in having Defendant Camp continue the video and advisement services. Defendant Camp advised each client that he would have to establish a new entity and contract to continue to work for them.

¶ 73    Defendants' denial of Duffy's allegations in their discovery responses demonstrates that there exists a genuine issue of material fact, thus rendering summary judgment inappropriate as to this claim as well. *See In re Will of Jones*, 362 N.C. at 577, 669 S.E.2d at 578 ("[M]uch of the deposition testimony and affidavits is open to competing interpretations. Given our standard of review, however, we view this evidence in the light most favorable to [the plaintiff] and find that he has forecast sufficient facts" to survive summary judgment.). The trial court's order is reversed with respect to Duffy's derivative unjust enrichment claim.

### 6. *Unfair and Deceptive Trade Practices*

¶ 74    Duffy also raises a claim against Defendants for unfair and deceptive trade

practices. Duffy argues that "Defendants' conduct at issue [wa]s unfair and deceptive" in that Defendants "deceptively diverted existing business of the [Corporation] to the New Entity and carried on said business through the New Entity."

¶ 75        To recover under North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1, "a plaintiff must establish that: (1) [the] defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff[,]" *Nobel v. Foxmoor Grp., LLC*, 380 N.C. 116, 2022-NCSC-10, ¶ 11 (citation and internal quotation marks omitted).

¶ 76        Subsection 75-1.1(b) provides that, "[f]or purposes of this section, 'commerce' includes all business activities, however denominated, but does not include professional services rendered by a member of a learned profession." N.C. Gen. Stat. § 75-1.1(b). With respect to this definition of "commerce," our Supreme Court has repeatedly held that the "internal operations of a single business . . . are not business activities within the General Assembly's intended meaning of the term." *White v. Thompson*, 364 N.C. 47, 52, 691 S.E.2d 676, 679 (2010). "As a result, any unfair or deceptive conduct contained solely within a single business is not covered by the Act." *Id.* at 53, 691 S.E.2d at 680. "The determination of whether an act or practice is in or affects commerce is one of law." *J. M. Westall & Co. v. Windswept View of Asheville, Inc.*, 97 N.C. App. 71, 75, 387 S.E.2d 67, 69, *disc. review denied*, 327 N.C. 139, 394

S.E.2d 175 (1990).

¶ 77    Defendants argue that summary judgment was appropriate as to this claim because "the entire dispute in this case centers around the internal operations of the [Corporation], and more specifically, the desire of certain parties to no longer be in business together." However, Defendants' characterization is incorrect; Duffy's allegations focus heavily on the various clients to whom services had been and were to be rendered, as well as on the New Entity as a beneficiary of the alleged unfair and deceptive acts. Where "there are multiple companies . . . involved," this Court has concluded that an individual defendant's interruption of the commercial relationship between those companies is "in or affecting commerce" and may properly constitute an unfair or deceptive act or practice under § 75-1.1. *Songwooyarn Trading Co. v. Sox Eleven, Inc.*, 213 N.C. App. 49, 57, 714 S.E.2d 162, 168, *disc. review denied*, 365 N.C. 360, 718 S.E.2d 396 (2011).

¶ 78    Therefore, summary judgment was inappropriate with respect to Duffy's unfair and deceptive trade practices claim, and the trial court's order is reversed as to this claim. Moreover, as with Duffy's unjust enrichment claim, discussed above, Duffy does not allege that he "suffer[ed] an injury that is distinct from the injury suffered by the corporation itself" as to this claim. *Corwin*, 371 N.C. at 612, 821 S.E.2d at 735 (citation and internal quotation marks omitted). Accordingly, this claim must proceed derivatively. *See Norman*, 140 N.C. App. at 395, 537 S.E.2d at 253.

### 7. *Civil Conspiracy*

¶ 79    Finally, Duffy also asserts a claim against Camp and Johnson for civil conspiracy.

¶ 80    The elements of civil conspiracy are well established:

> A claim for damages resulting from a conspiracy exists where there is an agreement between two or more persons to do an unlawful act or to do a lawful act in an unlawful way, and, as a result of acts done in furtherance of, and pursuant to, the agreement, damage occurs to the plaintiff. In such a case, all of the conspirators are liable, jointly and severally, for the act of any one of them done in furtherance of the agreement.

*Fox v. Wilson*, 85 N.C. App. 292, 301, 354 S.E.2d 737, 743 (1987) (citations omitted).

¶ 81    In addition, it is equally "well established that there is not a separate civil action for civil conspiracy in North Carolina. Instead, civil conspiracy is premised on the underlying act." *Piraino Bros., LLC v. Atl. Fin. Grp., Inc.*, 211 N.C. App. 343, 350, 712 S.E.2d 328, 333 (citations and internal quotation marks omitted), *disc. review denied*, 365 N.C. 357, 718 S.E.2d 391 (2011). Accordingly, recovery in a civil conspiracy claim "must be on the basis of sufficiently alleged wrongful overt acts. The charge of conspiracy itself does nothing more than associate the defendants together and perhaps liberalize the rules of evidence to the extent that under proper circumstances the acts and conduct of one might be admissible against all." *Shope v. Boyer*, 268 N.C. 401, 405, 150 S.E.2d 771, 773–74 (1966).

¶ 82          Here, Duffy argues that "the conspiracy is Camp and Johnson's plan to form the New Entity, move the [Corporation]'s assets and business to the New Entity, and thereafter carry on the [Corporation]'s business through the New Entity so as to . . . exclude Duffy and his interests as a shareholder." He additionally alleges that "in February and March of 2020, Camp and Johnson 'decided the manner in which the [Corporation] was operated would need to change' and 'made a final decision that they could no longer partner' with [Duffy]."

¶ 83          Defendants respond that Duffy cannot "use the same alleged acts to form both the basis of a claim for conspiracy to commit certain torts *and* the basis of claims for those torts." *Jones v. City of Greensboro,* 51 N.C. App. 571, 584, 277 S.E.2d 562, 571 (1981), *overruled on other grounds by Fowler v. Valencourt,* 334 N.C. 345, 435 S.E.2d 530 (1993). However, the import of Duffy's conspiracy claim appears to be that, through an action for damages resulting from a conspiracy, he may recover "jointly and severally . . . for the act of any [conspirator] done in furtherance of the agreement." *Fox*, 85 N.C. App. at 301, 354 S.E.2d at 743. This would entitle Duffy to recover damages, jointly and severally, from Johnson and the Corporation as well as Camp for *the conspiracy* to commit the base tort, for which only Camp may be liable.

¶ 84          We have concluded that summary judgment is inappropriate as to Duffy's derivative claims for: (1) Camp's breach of fiduciary duty to the Corporation; (2) unjust enrichment; and (3) unfair and deceptive trade practices. So too is summary

judgment inappropriate on the corresponding conspiracy claim, to the extent that Duffy can show on remand that Defendants allegedly conspired to commit any of the underlying claims.

### 8. *Claim Abandoned on Appeal*

¶ 85    Duffy makes no argument on appeal that the trial court erred by granting summary judgment on his *Meiselman* claim. Therefore, this issue is deemed abandoned. N.C.R. App. P. 28(b)(6); *see, e.g.*, *Wilkerson v. Duke Univ.*, 229 N.C. App. 670, 679, 748 S.E.2d 154, 161 (2013).

## IV.    Conclusion

¶ 86    For the foregoing reasons, the trial court properly granted summary judgment with respect to all of Duffy's individual claims, as well as his derivative claims for: (1) breach of fiduciary duty that Camp and Johnson, as controlling shareholders, owed him, as a minority shareholder; (2) tradename infringement and Duffy's concomitant request for injunctive relief relating to that claim; and (3) conversion. We affirm the trial court's order as to those claims, as well as the *Meiselman* claim that was abandoned on appeal.

¶ 87    Summary judgment was inappropriate concerning Duffy's remaining derivative claims: (1) Camp's breach of fiduciary duty to the Corporation; (2) unjust enrichment; (3) unfair and deceptive trade practices; and (4) civil conspiracy. The trial court's order granting summary judgment in favor of Defendants is reversed as

to these claims. We remand to the trial court for further proceedings on these surviving derivative claims.

AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.

Chief Judge STROUD and Judge DIETZ concur.